# ROCK *v.* ARKANSAS

No. 86–130.   Argued March 23, 1987—Decided June 22, 1987

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which WHITE, O'CONNOR, and SCALIA, JJ., joined, *post*, p. 62.

*James M. Luffman* argued the cause and filed briefs for petitioner.

*J. Steven Clark*, Attorney General of Arkansas, argued the cause for respondent. With him on the brief was *Clint Miller*, Assistant Attorney General.*

JUSTICE BLACKMUN delivered the opinion of the Court.

The issue presented in this case is whether Arkansas' evidentiary rule prohibiting the admission of hypnotically refreshed testimony violated petitioner's constitutional right to testify on her own behalf as a defendant in a criminal case.

I

Petitioner Vickie Lorene Rock was charged with manslaughter in the death of her husband, Frank Rock, on July 2, 1983. A dispute had been simmering about Frank's wish to move from the couple's small apartment adjacent to Vickie's beauty parlor to a trailer she owned outside town. That night a fight erupted when Frank refused to let petitioner eat some pizza and prevented her from leaving the apartment to get something else to eat. App. 98, 103–104. When police arrived on the scene they found Frank on the floor with a bullet wound in his chest. Petitioner urged the officers to help

---

*\*John K. Van de Kamp*, Attorney General, *Steve White*, Chief Assistant Attorney General, *Arnold O. Overoye*, Assistant Attorney General, and *Shirley A. Nelson* and *Garrett Beaumont*, Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* urging affirmance.

*David M. Heilbron* and *Christopher Berka* filed a brief for the Product Liability Advisory Council et al. as *amici curiae*.

her husband, Tr. 230, and cried to a sergeant who took her in charge, "please save him" and "don't let him die." *Id.*, at 268. The police removed her from the building because she was upset and because she interfered with their investigation by her repeated attempts to use the telephone to call her husband's parents. *Id.*, at 263–264, 267–268. According to the testimony of one of the investigating officers, petitioner told him that "she stood up to leave the room and [her husband] grabbed her by the throat and choked her and threw her against the wall and . . . at that time she walked over and picked up the weapon and pointed it toward the floor and he hit her again and she shot him." *Id.*, at 281.[1]

Because petitioner could not remember the precise details of the shooting, her attorney suggested that she submit to hypnosis in order to refresh her memory. Petitioner was hypnotized twice by Doctor Bettye Back, a licensed neuro-psychologist with training in the field of hypnosis. *Id.*, at 901–903. Doctor Back interviewed petitioner for an hour prior to the first hypnosis session, taking notes on petitioner's general history and her recollections of the shooting. App. 46–47.[2] Both hypnosis sessions were recorded on

---

[1] Another officer reported a slightly different version of the events:

"She stated that she had told her husband that she was going to go outside. He refused to let her leave and grabbed her by the throat and began choking her. They struggled for a moment and she grabbed a gun. She told him to leave her alone and he hit her at which time the gun went off. She stated that it was an accident and she didn't mean to shoot him. She said she had to get to the hospital and talk to him." Tr. 388.

See also *id.*, at 301–304, 337–338; App. 3–10.

[2] Doctor Back's handwritten notes regarding petitioner's memory of the day of the shooting read as follows:

"Pt states she & husb. were discussing moving out to a trailer she had prev. owned. He was 'set on' moving out to the trailer—she felt they should discuss. She bec[ame] upset & went to another room to lay down. Bro. came & left. She came out to eat some of the pizza, he wouldn't allow her to have any. She said she would go out and get [something] to eat he wouldn't allow her—He pushed her against a wall an end table in the cor-

tape. *Id.*, at 53. Petitioner did not relate any new information during either of the sessions, *id.*, at 78, 83, but, after the hypnosis, she was able to remember that at the time of the incident she had her thumb on the hammer of the gun, but had not held her finger on the trigger. She also recalled that the gun had discharged when her husband grabbed her arm during the scuffle. *Id.*, at 29, 38. As a result of the details that petitioner was able to remember about the shooting, her counsel arranged for a gun expert to examine the handgun, a single-action Hawes .22 Deputy Marshal. That inspection revealed that the gun was defective and prone to fire, when hit or dropped, without the trigger's being pulled. Tr. 662–663, 711.

When the prosecutor learned of the hypnosis sessions, he filed a motion to exclude petitioner's testimony. The trial judge held a pretrial hearing on the motion and concluded that no hypnotically refreshed testimony would be admitted. The court issued an order limiting petitioner's testimony to "matters remembered and stated to the examiner prior to being placed under hypnosis." App. to Pet. for Cert. xvii.[3]

---

ner [with] a gun on it. They were the night watchmen for business that sets behind them. She picked gun up stated she didn't want him hitting her anymore. He wouldn't let her out door, slammed door & 'gun went off & he fell & he died' [pt looked misty eyed here—near tears]" (additions by Doctor Back). App. 40.

[3] The full pretrial order reads as follows:

"NOW on this 26th day of November, 1984, comes on the captioned matter for pre-trial hearing, and the Court finds:

"1. On September 27 and 28, 1984, Defendant was placed under hypnotic trance by Dr. Bettye Back, PhD, Fayetteville, Arkansas, for the express purpose of enhancing her memory of the events of July 2, 1983, involving the death of Frank Rock.

"2. Dr. Back was professionally qualified to administer hypnosis. She was objective in the application of the technique and did not suggest by leading questions the responses expected to be made by Defendant. She was employed on an independent, professional basis. She made written notes of facts related to her by Defendant during the pre-hypnotic interview. She did employ post-hypnotic suggestion with Defendant. No one

At trial, petitioner introduced testimony by the gun expert, Tr. 647–712, but the court limited petitioner's own description of the events on the day of the shooting to a reiteration of the sketchy information in Doctor Back's notes.   See App. 96–104.[4]   The jury convicted petitioner on the manslaughter charge and she was sentenced to 10 years' imprisonment and a $10,000 fine.

On appeal, the Supreme Court of Arkansas rejected petitioner's claim that the limitations on her testimony violated her right to present her defense.   The court concluded that "the dangers of admitting this kind of testimony outweigh whatever probative value it may have," and decided to follow

---

else was present during any phase of the hypnosis sessions except Dr. Back and Defendant.

"3. Defendant cannot be prevented by the Court from testifying at her trial on criminal charges under the Arkansas Constitution, but testimony of matters recalled by Defendant due to hypnosis will be excluded because of inherent unreliability and the effect of hypnosis in eliminating any meaningful cross-examination on those matters.   Defendant may testify to matters remembered and stated to the examiner prior to being placed under hypnosis.   Testimony resulting from post-hypnotic suggestion will be excluded."   App. to Pet. for Cert. xvii.

[4] When petitioner began to testify, she was repeatedly interrupted by the prosecutor, who objected that her statements fell outside the scope of the pretrial order.   Each time she attempted to describe an event on the day of the shooting, she was unable to proceed for more than a few words before her testimony was ruled inadmissible.   For example, she was unable to testify without objection about her husband's activities on the morning of the shooting, App. 11, about their discussion and disagreement concerning the move to her trailer, *id.*, at 12, 14, about her husband's and his brother's replacing the shock absorbers on a van, *id.*, at 16, and about her brother-in-law's return to eat pizza, *id.*, at 19–20.   She then made a proffer, outside the hearing of the jury, of testimony about the fight in an attempt to show that she could adhere to the court's order.   The prosecution objected to every detail not expressly described in Doctor Back's notes or in the testimony the doctor gave at the pretrial hearing.   *Id.*, at 32–35. The court agreed with the prosecutor's statement that "ninety-nine percent of everything [petitioner] testified to in the proffer" was inadmissible. *Id.*, at 35.

the approach of States that have held hypnotically refreshed testimony of witnesses inadmissible *per se*. 288 Ark. 566, 573, 708 S. W. 2d 78, 81 (1986). Although the court acknowledged that "a defendant's right to testify is fundamental," *id.*, at 578, 708 S. W. 2d, at 84, it ruled that the exclusion of petitioner's testimony did not violate her constitutional rights. Any "prejudice or deprivation" she suffered "was minimal and resulted from her own actions and not by any erroneous ruling of the court." *Id.*, at 580, 708 S. W. 2d, at 86. We granted certiorari, 479 U. S. 947 (1986), to consider the constitutionality of Arkansas' *per se* rule excluding a criminal defendant's hypnotically refreshed testimony.

## II

Petitioner's claim that her testimony was impermissibly excluded is bottomed on her constitutional right to testify in her own defense. At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense. This, of course, is a change from the historic common-law view, which was that all parties to litigation, including criminal defendants, were disqualified from testifying because of their interest in the outcome of the trial. See generally 2 J. Wigmore, Evidence §§ 576, 579 (J. Chadbourn rev. 1979). The principal rationale for this rule was the possible untrustworthiness of a party's testimony. Under the common law, the practice did develop of permitting criminal defendants to tell their side of the story, but they were limited to making an unsworn statement that could not be elicited through direct examination by counsel and was not subject to cross-examination. *Id.*, at § 579, p. 827.

This Court in *Ferguson* v. *Georgia*, 365 U. S. 570, 573–582 (1961), detailed the history of the transition from a rule of a defendant's incompetency to a rule of competency. As the

Court there recounted, it came to be recognized that permitting a defendant to testify advances both the "'detection of guilt'" and "'the protection of innocence,'" *id.*, at 581, quoting 1 Am. L. Rev. 396 (1867), and by the end of the second half of the 19th century,[5] all States except Georgia had enacted statutes that declared criminal defendants competent to testify. See 365 U. S., at 577 and n. 6, 596–598.[6] Congress enacted a general competency statute in the Act of Mar. 16, 1878, 20 Stat. 30, as amended, 18 U. S. C. § 3481, and similar developments followed in other common-law countries. Thus, more than 25 years ago this Court was able to state:

> "In sum, decades ago the considered consensus of the English-speaking world came to be that there was no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case." *Ferguson* v. *Georgia*, 365 U. S., at 582.[7]

---

[5] The removal of the disqualifications for accused persons occurred later than the establishment of the competence to testify of civil parties. 2 J. Wigmore, Evidence § 579, p. 826 (J. Chadbourn rev. 1979). This was not due to concern that criminal defendants were more likely to be unreliable than other witnesses, but to a concern for the accused:

"If, being competent, he failed to testify, that (it was believed) would damage his cause more seriously than if he were able to claim that his silence were enforced by law. Moreover, if he did testify, that (it was believed) would injure more than assist his cause, since by undergoing the ordeal of cross-examination, he would appear at a disadvantage dangerous even to an innocent man." *Id.*, at 828.

[6] The Arkansas Constitution guarantees an accused the right "to be heard by himself and his counsel." Art. 2, § 10. Rule 601 of the Arkansas Rules of Evidence provides a general rule of competency: "Every person is competent to be a witness except as otherwise provided in these rules."

[7] *Ferguson* v. *Georgia* struck down as unconstitutional under the Fourteenth Amendment a Georgia statute that limited a defendant's presentation at trial to an unsworn statement, insofar as it denied the accused "the right to have his counsel question him to elicit his statement." 365 U. S., at 596. The Court declined to reach the question of a defendant's

The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that "are essential to due process of law in a fair adversary process." *Faretta* v. *California*, 422 U. S. 806, 819, n. 15 (1975). The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony:

> "A person's right to reasonable notice of a charge against him, and *an opportunity to be heard in his defense*—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." (Emphasis added.) *In re Oliver*, 333 U. S. 257, 273 (1948).[8]

See also *Ferguson* v. *Georgia*, 365 U. S., at 602 (Clark, J., concurring) (Fourteenth Amendment secures "right of a criminal defendant to choose between silence and testifying in his own behalf").[9]

---

constitutional right to testify, because the case did not involve a challenge to the particular Georgia statute that rendered a defendant incompetent to testify. *Id.*, at 572, n. 1. Two Justices, however, urged that such a right be recognized explicitly. *Id.*, at 600–601, 602 (concurring opinions).

[8] Before *Ferguson* v. *Georgia*, it might have been argued that a defendant's ability to present an unsworn statement would satisfy this right. Once that procedure was eliminated, however, there was no longer any doubt that the right to be heard, which is so essential to due process in an adversary system of adjudication, could be vindicated only by affording a defendant an opportunity to testify before the factfinder.

[9] This right reaches beyond the criminal trial: the procedural due process constitutionally required in some extrajudicial proceedings includes the right of the affected person to testify. See, *e. g.*, *Gagnon* v. *Scarpelli*, 411 U. S. 778, 782, 786 (1973) (probation revocation); *Morrissey* v. *Brewer*, 408 U. S. 471, 489 (1972) (parole revocation); *Goldberg* v. *Kelly*, 397 U. S. 254, 269 (1970) (termination of welfare benefits).

The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor," a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment. *Washington* v. *Texas*, 388 U. S. 14, 17–19 (1967). Logically included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 867 (1982), is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many criminal cases is the defendant himself. There is no justification today for a rule that denies an accused the opportunity to offer his own testimony. Like the truthfulness of other witnesses, the defendant's veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination. See generally Westen, The Compulsory Process Clause, 73 Mich. L. Rev. 71, 119–120 (1974).

Moreover, in *Faretta* v. *California*, 422 U. S., at 819, the Court recognized that the Sixth Amendment

> "grants to the accused *personally* the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'" (Emphasis added.)

Even more fundamental to a personal defense than the right of self-representation, which was found to be "necessarily implied by the structure of the Amendment," *ibid.*, is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.

The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. In *Harris* v. *New York*, 401 U. S. 222, 230 (1971),

the Court stated: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Id.*, at 225. Three of the dissenting Justices in that case agreed that the Fifth Amendment encompasses this right: "[The Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' . . . The choice of whether to testify in one's own defense . . . is an exercise of the constitutional privilege." *Id.*, at 230, quoting *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964). (Emphasis removed.)[10]

## III

The question now before the Court is whether a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony. This is not the first time this Court has faced a constitutional challenge to a state rule, designed to ensure trustworthy evidence, that interfered with the ability of a defendant to offer testimony. In *Washington* v. *Texas*, 388 U. S. 14 (1967), the Court was confronted with a state statute that prevented persons charged as principals, accomplices, or accessories in the same crime from being introduced as witnesses for one another. The statute, like the original common-law prohibition on testimony by the accused, was grounded in a concern for the reliability of evidence presented by an interested party:

> "It was thought that if two·persons charged with the same crime were allowed to testify on behalf of each

---

[10] On numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right. See, *e. g.*, *Nix* v. *Whiteside*, 475 U. S. 157, 164 (1986); *id.*, at 186, n. 5 (BLACKMUN, J., concurring in judgment); *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983) (defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to . . . testify in his or her own behalf"); *Brooks* v. *Tennessee*, 406 U. S. 605, 612 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right").

other, 'each would try to swear the other out of the charge.' This rule, as well as the other disqualifications for interest, rested on the unstated premises that the right to present witnesses was subordinate to the court's interest in preventing perjury, and that erroneous decisions were best avoided by preventing the jury from hearing any testimony that might be perjured, even if it were the only testimony available on a crucial issue." (Footnote omitted.) *Id.*, at 21, quoting *Benson* v. *United States*, 146 U. S. 325, 335 (1892).

As the Court recognized, the incompetency of a codefendant to testify had been rejected on nonconstitutional grounds in 1918, when the Court, refusing to be bound by "the dead hand of the common-law rule of 1789," stated:

"'[T]he conviction of our time [is] that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court . . . .'" 388 U. S., at 22, quoting *Rosen* v. *United States*, 245 U. S. 467, 471 (1918).

The Court concluded that this reasoning was compelled by the Sixth Amendment's protections for the accused. In particular, the Court reasoned that the Sixth Amendment was designed in part "to make the testimony of a defendant's witnesses admissible on his behalf in court." 388 U. S., at 22.

With the rationale for the common-law incompetency rule thus rejected on constitutional grounds, the Court found that the mere presence of the witness in the courtroom was not enough to satisfy the Constitution's Compulsory Process Clause. By preventing the defendant from having the benefit of his accomplice's testimony, "the State *arbitrarily* denied him the right to put on the stand a witness who was

physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." (Emphasis added.) *Id.*, at 23.

Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony. In *Chambers* v. *Mississippi*, 410 U. S. 284 (1973), the Court invalidated a State's hearsay rule on the ground that it abridged the defendant's right to "present witnesses in his own defense." *Id.*, at 302. Chambers was tried for a murder to which another person repeatedly had confessed in the presence of acquaintances. The State's hearsay rule, coupled with a "voucher" rule that did not allow the defendant to cross-examine the confessed murderer directly, prevented Chambers from introducing testimony concerning these confessions, which were critical to his defense. This Court reversed the judgment of conviction, holding that when a state rule of evidence conflicts with the right to present witnesses, the rule may "not be applied mechanistically to defeat the ends of justice," but must meet the fundamental standards of due process. *Ibid.* In the Court's view, the State in *Chambers* did not demonstrate that the hearsay testimony in that case, which bore "assurances of trustworthiness" including corroboration by other evidence, would be unreliable, and thus the defendant should have been able to introduce the exculpatory testimony. *Ibid.*

Of course, the right to present relevant testimony is not without limitation. The right "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.*, at 295.[11] But restrictions of a

---

[11] Numerous state procedural and evidentiary rules control the presentation of evidence and do not offend the defendant's right to testify. See, e. g., *Chambers* v. *Mississippi*, 410 U. S., at 302 ("In the exercise of this

defendant's right to testify may not be arbitrary or dispro-
portionate to the purposes they are designed to serve. In
applying its evidentiary rules a State must evaluate whether
the interests served by a rule justify the limitation imposed
on the defendant's constitutional right to testify.

## IV

The Arkansas rule enunciated by the state courts does not
allow a trial court to consider whether posthypnosis testi-
mony may be admissible in a particular case; it is a *per se* rule
prohibiting the admission at trial of any defendant's hypnoti-
cally refreshed testimony on the ground that such testimony
is always unreliable.[12] Thus, in Arkansas, an accused's testi-
mony is limited to matters that he or she can prove were
remembered *before* hypnosis. This rule operates to the det-
riment of any defendant who undergoes hypnosis, without re-
gard to the reasons for it, the circumstances under which it
took place, or any independent verification of the information
it produced.[13]

---

right, the accused, as is required of the State, must comply with estab-
lished rules of procedure and evidence designed to assure both fairness and
reliability in the ascertainment of guilt and innocence"); *Washington* v.
*Texas*, 388 U. S. 14, 23, n. 21 (1967) (opinion should not be construed as
disapproving testimonial privileges or nonarbitrary rules that disqualify
those incapable of observing events due to mental infirmity or infancy from
being witnesses).

[12] The rule leaves a trial judge no discretion to admit this testimony,
even if the judge is persuaded of its reliability by testimony at a pre-
trial hearing. Tr. of Oral Arg. 36 (statement of the Attorney General of
Arkansas).

[13] The Arkansas Supreme Court took the position that petitioner was
fully responsible for any prejudice that resulted from the restriction on her
testimony because it was she who chose to resort to the technique of hyp-
nosis. 288 Ark. 566, 580, 708 S. W. 2d 78, 86 (1986). The prosecution and
the trial court each expressed a similar view and the theme was renewed
repeatedly at trial as a justification for limiting petitioner's testimony.
See App. 15, 20, 21–22, 24, 36. It should be noted, however, that Arkan-
sas had given no previous indication that it looked with disfavor on the use

In this case, the application of that rule had a significant adverse effect on petitioner's ability to testify. It virtually prevented her from describing any of the events that occurred on the day of the shooting, despite corroboration of many of those events by other witnesses. Even more importantly, under the court's rule petitioner was not permitted to describe the actual shooting except in the words contained in Doctor Back's notes. The expert's description of the gun's tendency to misfire would have taken on greater significance if the jury had heard petitioner testify that she did not have her finger on the trigger and that the gun went off when her husband hit her arm.

In establishing its *per se* rule, the Arkansas Supreme Court simply followed the approach taken by a number of States that have decided that hypnotically enhanced testimony should be excluded at trial on the ground that it tends to be unreliable.[14]   Other States that have adopted an exclusionary rule, however, have done so for the testimony of *witnesses*, not for the testimony of a *defendant*.   The Arkansas

---

of hypnosis to assist in the preparation for trial and there were no previous state-court rulings on the issue.

[14] See, *e. g.*, *Contreras* v. *State*, 718 P. 2d 129 (Alaska 1986); *State ex rel. Collins* v. *Superior Court, County of Maricopa*, 132 Ariz. 180, 207–208, 644 P. 2d 1266, 1293–1294 (1982); *People* v. *Quintanar*, 659 P. 2d 710, 711 (Colo. App. 1982); *State* v. *Davis*, 490 A. 2d 601 (Del. Super. 1985); *Bundy* v. *State*, 471 So. 2d 9, 18–19 (Fla. 1985), cert. denied, 479 U. S. 894 (1986); *State* v. *Moreno*, 68 Haw. 233, 709 P. 2d 103 (1985); *State* v. *Haislip*, 237 Kan. 461, 482, 701 P. 2d 909, 925–926, cert. denied, 474 U. S. 1022 (1985); *State* v. *Collins*, 296 Md. 670, 464 A. 2d 1028 (1983); *Commonwealth* v. *Kater*, 388 Mass. 519, 447 N. E. 2d 1190 (1983); *People* v. *Gonzales*, 415 Mich. 615, 329 N. W. 2d 743 (1982), opinion added to, 417 Mich. 1129, 336 N. W. 2d 751 (1983); *Alsbach* v. *Bader*, 700 S. W. 2d 823 (Mo. 1985); *State* v. *Palmer*, 210 Neb. 206, 218, 313 N. W. 2d 648, 655 (1981); *People* v. *Hughes*, 59 N. Y. 2d 523, 453 N. E. 2d 484 (1983); *Robison* v. *State*, 677 P. 2d 1080, 1085 (Okla. Crim. App.), cert. denied, 467 U. S. 1246 (1984); *Commonwealth* v. *Nazarovitch*, 496 Pa. 97, 110, 436 A. 2d 170, 177 (1981); *State* v. *Martin*, 101 Wash. 2d 713, 684 P. 2d 651 (1984).   See *State* v. *Ture*, 353 N. W. 2d 502, 513–514 (Minn. 1984).

Supreme Court failed to perform the constitutional analysis that is necessary when a defendant's right to testify is at stake.[15]

Although the Arkansas court concluded that any testimony that cannot be proved to be the product of prehypnosis memory is unreliable, many courts have eschewed a *per se* rule and permit the admission of hypnotically refreshed testimony.[16] Hypnosis by trained physicians or psychologists has

---

[15] The Arkansas court relied on a California case, *People* v. *Shirley*, 31 Cal. 3d 18, 723 P. 2d 1354, cert. denied, 459 U. S. 860 (1982), for much of its reasoning as to the unreliability of hypnosis. 288 Ark., at 575–578, 708 S. W. 2d, at 83–84. But while the California court adopted a far stricter general rule—barring entirely testimony by any witness who has been hypnotized—it explicitly excepted testimony by an accused:

"[W]hen it is the defendant himself—not merely a defense witness—who submits to pretrial hypnosis, the experience will not render his testimony inadmissible if he elects to take the stand. In that case, the rule we adopt herein is subject to a necessary exception to avoid impairing the fundamental right of an accused to testify in his own behalf." 31 Cal. 3d, at 67, 723 P. 2d, at 1384.

This case does not involve the admissibility of testimony of previously hypnotized witnesses other than criminal defendants and we express no opinion on that issue.

[16] Some jurisdictions have adopted a rule that hypnosis affects the credibility, but not the admissibility, of testimony. See, *e. g., Beck* v. *Norris*, 801 F. 2d 242, 244–245 (CA6 1986); *United States* v. *Awkard*, 597 F. 2d 667, 669 (CA9), cert. denied, 444 U. S. 885 (1979); *State* v. *Wren*, 425 So. 2d 756 (La. 1983); *State* v. *Brown*, 337 N. W. 2d 138, 151 (N. D. 1983); *State* v. *Glebock*, 616 S. W. 2d 897, 903–904 (Tenn. Crim. App. 1981); *Chapman* v. *State*, 638 P. 2d 1280, 1282 (Wyo. 1982).

Other courts conduct an individualized inquiry in each case. See, *e. g., McQueen* v. *Garrison*, 814 F. 2d 951, 958 (CA4 1987) (reliability evaluation); *Wicker* v. *McCotter*, 783 F. 2d 487, 492–493 (CA5) (probative value of the testimony weighed against its prejudicial effect), cert. denied, 478 U. S. 1010 (1986); *State* v. *Iwakiri*, 106 Idaho 618, 625, 682 P. 2d 571, 578 (1984) (weigh "totality of circumstances").

In some jurisdictions, courts have established procedural prerequisites for admissibility in order to reduce the risks associated with hypnosis. Perhaps the leading case in this line is *State* v. *Hurd*, 86 N. J. 525, 432 A. 2d 86 (1981). See also *Sprynczynatyk* v. *General Motors Corp.*, 771 F. 2d

been recognized as a valid therapeutic technique since 1958, although there is no generally accepted theory to explain the phenomenon, or even a consensus on a single definition of hypnosis. See Council on Scientific Affairs, Scientific Status of Refreshing Recollection by the Use of Hypnosis, 253 J. A. M. A. 1918, 1918–1919 (1985) (Council Report).[17] The use of hypnosis in criminal investigations, however, is controversial, and the current medical and legal view of its appropriate role is unsettled.

Responses of individuals to hypnosis vary greatly. The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections.[18] Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject

---

1112, 1122–1123 (CA8 1985), cert. denied, 475 U. S. 1046 (1986); *United States v. Harrington,* 18 M. J. 797, 803 (A. C. M. R. 1984); *House v. State,* 445 So. 2d 815, 826–827 (Miss. 1984); *State v. Beachum,* 97 N. M. 682, 689–690, 643 P. 2d 246, 253–254 (App. 1981), writ quashed, 98 N. M. 51, 644 P. 2d 1040 (1982); *State v. Weston,* 16 Ohio App. 3d 279, 287, 475 N. E. 2d 805, 813 (1984); *State v. Armstrong,* 110 Wis. 2d 555, 329 N. W. 2d 386, cert. denied, 461 U. S. 946 (1983).

[17] Hypnosis has been described as "involv[ing] the focusing of attention; increased responsiveness to suggestions; suspension of disbelief with a lowering of critical judgment; potential for altering perception, motor control, or memory in response to suggestions; and the subjective experience of responding involuntarily." Council Report, 253 J. A. M. A., at 1919.

[18] "[W]hen hypnosis is used to refresh recollection, one of the following outcomes occurs: (1) hypnosis produces recollections that are not substantially different from nonhypnotic recollections; (2) it yields recollections that are more inaccurate than nonhypnotic memory; or, most frequently, (3) it results in more information being reported, but these recollections contain both accurate and inaccurate details. . . . There are no data to support a fourth alternative, namely, that hypnosis increases remembering of only accurate information." *Id.,* at 1921.

thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult. See generally M. Orne et al., Hypnotically Induced Testimony, in Eyewitness Testimony: Psychological Perspectives 171 (G. Wells & E. Loftus, eds., 1984); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif. L. Rev. 313, 333–342 (1980). Despite the unreliability that hypnosis concededly may introduce, however, the procedure has been credited as instrumental in obtaining investigative leads or identifications that were later confirmed by independent evidence. See, *e. g., People* v. *Hughes,* 59 N. Y. 2d 523, 533, 453 N. E. 2d 484, 488 (1983); see generally R. Udolf, Forensic Hypnosis 11–16 (1983).

The inaccuracies the process introduces can be reduced, although perhaps not eliminated, by the use of procedural safeguards. One set of suggested guidelines calls for hypnosis to be performed only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation. See Orne, The Use and Misuse of Hypnosis in Court, 27 Int'l J. Clinical and Experimental Hypnosis 311, 335–336 (1979). These procedures reduce the possibility that biases will be communicated to the hypersuggestive subject by the hypnotist. Suggestion will be less likely also if the hypnosis is conducted in a neutral setting with no one present but the hypnotist and the subject. Tape or video recording of all interrogations, before, during, and after hypnosis, can help reveal if leading questions were asked. *Id.,* at 336.[19] Such guidelines do not guarantee the accuracy of the testimony, because they cannot control the subject's own

---

[19] Courts have adopted varying versions of these safeguards. See n. 16, *supra.* Oregon by statute has a requirement for procedural safeguards for hypnosis. Ore. Rev. Stat. § 136.675 (1985).

motivations or any tendency to confabulate, but they do provide a means of controlling overt suggestions.

The more traditional means of assessing accuracy of testimony also remain applicable in the case of a previously hypnotized defendant. Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence. Cross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions. Indeed, it is probably to a defendant's advantage to establish carefully the extent of his memory prior to hypnosis, in order to minimize the decrease in credibility the procedure might introduce.

We are not now prepared to endorse without qualifications the use of hypnosis as an investigative tool; scientific understanding of the phenomenon and of the means to control the effects of hypnosis is still in its infancy. Arkansas, however, has not justified the exclusion of *all* of a defendant's testimony that the defendant is unable to prove to be the product of prehypnosis memory. A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.

In this case, the defective condition of the gun corroborated the details petitioner remembered about the shooting. The tape recordings provided some means to evaluate the hypnosis and the trial judge concluded that Doctor Back did not suggest responses with leading questions. See n. 3, *supra.* Those circumstances present an argument for admissibility of petitioner's testimony in this particular case, an argument that must be considered by the trial court. Arkansas' *per se* rule excluding all posthypnosis testimony infringes impermissibly on the right of a defendant to testify on his own behalf.[20]

The judgment of the Supreme Court of Arkansas is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

In deciding that petitioner Rock's testimony was properly limited at her trial, the Arkansas Supreme Court cited several factors that undermine the reliability of hypnotically induced testimony. Like the Court today, the Arkansas Supreme Court observed that a hypnotized individual becomes subject to suggestion, is likely to confabulate, and experiences artificially increased confidence in both true and false memories following hypnosis. No known set of procedures, both courts agree, can insure against the inherently unreliable nature of such testimony. Having acceded to the

---

[20] This disposition makes it unnecessary to consider petitioner's claims that the trial court's order restricting her testimony was unconstitutionally broad and that the trial court's application of the order resulted in a denial of due process of law. We also need not reach petitioner's argument that Arkansas' restriction on her testimony interferes with her Sixth Amendment right to counsel. Petitioner concedes that there is a "substantial question" whether she raised this federal question on appeal to the Arkansas Supreme Court. Reply Brief for Petitioner 2.

factual premises of the Arkansas Supreme Court, the Court nevertheless concludes that a state trial court must attempt to make its own scientific assessment of reliability in each case it is confronted with a request for the admission of hypnotically induced testimony. I find no justification in the Constitution for such a ruling.

In the Court's words, the decision today is "bottomed" on recognition of Rock's "constitutional right to testify in her own defense." *Ante*, at 49. While it is true that this Court, in dictum, has recognized the existence of such a right, see, *e. g., Faretta* v. *California*, 422 U. S. 806, 819, n. 15 (1975), the principles identified by the Court as underlying this right provide little support for invalidating the evidentiary rule applied by the Arkansas Supreme Court.

As a general matter, the Court first recites, a defendant's right to testify facilitates the truth-seeking function of a criminal trial by advancing both the " 'detection of guilt' " and " 'the protection of innocence.' " *Ante*, at 50, quoting *Ferguson* v. *Georgia*, 365 U. S. 570, 581 (1961). Such reasoning is hardly controlling here, where advancement of the truth-seeking function of Rock's trial was the sole motivation behind limiting her testimony. The Court also posits, however, that "a rule that denies an accused the opportunity to offer his own testimony" cannot be upheld because, "[l]ike the truthfulness of other witnesses, the defendant's veracity . . . can be tested adequately by cross-examination." *Ante*, at 52. But the Court candidly admits that the increased confidence inspired by hypnotism makes "cross-examination more difficult," *ante*, at 60, thereby diminishing an adverse party's ability to test the truthfulness of defendants such as Rock. Nevertheless, we are told, the exclusion of a defendant's testimony cannot be sanctioned because the defendant " 'above all others may be in a position to meet the prosecution's case.' " *Ante*, at 50, quoting *Ferguson* v. *Georgia*, *supra*, at 582. In relying on such reasoning, the Court apparently forgets that the issue before us arises only by virtue

of Rock's memory loss, which rendered her less able "to meet the prosecution's case."   365 U. S., at 582.

In conjunction with its reliance on broad principles that have little relevance here, the Court barely concerns itself with the recognition, present throughout our decisions, that an individual's right to present evidence is subject always to reasonable restrictions.   Indeed, the due process decisions relied on by the Court all envision that an individual's right to present evidence on his behalf is not absolute and must often-times give way to countervailing considerations.   See, *e. g.,* *In re Oliver,* 333 U. S. 257, 273, 275 (1948); *Morrissey* v. *Brewer,* 408 U. S. 471, 481–482 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970).   Similarly, our Compulsory Process Clause decisions make clear that the right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers* v. *Mississippi,* 410 U. S. 284, 295 (1973); see *Washington* v. *Texas,* 388 U. S. 14, 22 (1967).   The Constitution does not in any way relieve a defendant from compliance with "rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."   *Chambers* v. *Mississippi, supra,* at 302. Surely a rule designed to exclude testimony whose trustworthiness is inherently suspect cannot be said to fall outside this description.*

This Court has traditionally accorded the States "respect . . . in the establishment and implementation of their own criminal trial rules and procedures."   410 U. S., at 302–303; see, *e. g., Marshall* v. *Lonberger,* 459 U. S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not permit the fed-

---

*The Court recognizes, as it must, that rules governing "testimonial privileges [and] nonarbitrary rules that disqualify those incapable of observing events due to mental infirmity or infancy from being witnesses" do not "offend the defendant's right to testify." *Ante,* at 55–56, n. 11.   I fail to discern any meaningful constitutional difference between such rules and the one at issue here.

eral courts to engage in a finely tuned review of the wisdom of state evidentiary rules"); *Patterson* v. *New York*, 432 U. S. 197, 201 (1977) ("[W]e should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States"). One would think that this deference would be at its highest in an area such as this, where, as the Court concedes, "scientific understanding . . . is still in its infancy." *Ante*, at 61. Turning a blind eye to this concession, the Court chooses instead to restrict the ability of both state and federal courts to respond to changes in the understanding of hypnosis.

The Supreme Court of Arkansas' decision was an entirely permissible response to a novel and difficult question. See National Institute of Justice, Issues and Practices, M. Orne et al., Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence? 51 (1985). As an original proposition, the solution this Court imposes upon Arkansas may be equally sensible, though requiring the matter to be considered *res nova* by every single trial judge in every single case might seem to some to pose serious administrative difficulties. But until there is much more of a consensus on the use of hypnosis than there is now, the Constitution does not warrant this Court's mandating its own view of how to deal with the issue.