**Mario CAMPOS, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

No. 93–CV–2717 (CBA).

United States District Court, E.D. New York.

June 7, 1996.

Stuart Rubin, Brooklyn, NY, for petitioner.

Stephen D. Kelly, Assistant U.S. Attorney, U.S. Attorney's Office, Brooklyn, NY, for respondent.

## MEMORANDUM & ORDER

AMON, District Judge.

### I. Introduction

Petitioner Mario Campos seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Petitioner originally filed his motion *pro se,* contending that his constitutional rights had been violated because defense counsel at trial refused to allow him to testify.[1] In a letter to the Court dated May 20, 1995, petitioner notified the Court that his trial counsel was willing to provide an affidavit in support of these contentions.

In light of these allegations, the Court appointed counsel to represent petitioner in pursuing his requested relief and ordered an evidentiary hearing. Prior to the hearing, petitioner's trial counsel, Barry Asness, submitted an affidavit confirming that petitioner had expressed a wish to testify at trial, and that Asness had not permitted him to do so. At the hearing, both Asness and petitioner testified. The government and petitioner also filed additional briefs subsequent to the hearing.

After considering the testimony at the hearing and the briefs submitted by the government and petitioner, and for the reasons discussed below, the Court hereby grants the petition.

### II. Background

Petitioner was tried in a joint trial with three other co-defendants, including his wife, Nidia Campos ("Nidia"), and Edgar Vargas.

Petitioner was convicted of conspiring to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846, conspiring to conduct a financial transaction involving the proceeds of narcotics trafficking activity in violation of 18 U.S.C. § 371, and using a communication facility to facilitate the commission of a narcotics trafficking offense in violation of 21 U.S.C. § 843(b). Vargas was also convicted of all of the charges on which he was tried. Although the evidence established that Nidia Campos had a greater role in the narcotics transactions than petitioner, the jury could not reach a verdict in her case. She was retried. In her second trial, she was acquitted of the narcotics offense but convicted of conspiracy to conduct a financial transaction involving the proceeds of narcotics trafficking activity.

On April 14, 1992, petitioner was sentenced to a mandatory minimum term of 120 months' imprisonment and a five year term of supervised release based upon his conviction on the narcotics conspiracy charge. He received concurrent prison terms on the remaining charges. Nidia received a sentence of 54 months on her conviction for money laundering.

The Second Circuit Court of Appeals affirmed the judgments of conviction against petitioner, Nidia Campos, and Edgar Vargas. *United States v. Vargas,* 986 F.2d 35 (2d Cir.), *cert. denied,* 510 U.S. 827, 114 S.Ct. 91, 126 L.Ed.2d 59 (1993).

### A. Petitioner's Trial

At trial, the government's evidence primarily consisted of testimony of Drug Enforcement Administration ("DEA") agents, recorded conversations, and telephone records. The evidence against petitioner consisted almost exclusively of the testimony of Special Agent Robert Matos of the DEA.

The following is a summary of Matos' testimony. On June 9, 1989, while acting in an undercover capacity, Matos was introduced to Edgar Vargas. At that meeting, Vargas stated that he wanted to purchase cocaine. Matos and Vargas also discussed laundering

---

**1.** Petitioner also contended that his trial counsel suffered from a conflict of interest. This claim was subsequently withdrawn by petitioner's appointed counsel at oral argument.

narcotics proceeds. Vargas told Matos that his "associates" could launder as much money as Matos needed. Vargas explained further that one of his associates was a Hispanic man who owned a bar and who could change small bills into large bills for a fee of seven percent. His other associate was a woman who could launder money to other countries. At the conclusion of the meeting, Vargas told Matos that he would have to speak to his associates about the cocaine and the money laundering.

On June 20, 1989, Vargas and Matos met again. Vargas told Matos that he had spoken to his associates and that they would purchase a large quantity of cocaine. Vargas said that he would speak again to his associates and introduce Matos to them the next day.

On June 21, 1989, Matos met Vargas in Queens, and Vargas took him to McCabe's Bar and Grill, where he was introduced to the petitioner. According to Matos, petitioner said that Vargas had told him that Matos had a lot of money to launder. Petitioner said he could convert large amounts of money from small denomination bills to large denomination bills, and that laundering $500,000 per week would not be a problem. Matos also testified that petitioner asked him how much cocaine he could supply, and when Matos said 500 kilograms, petitioner responded that his wife was "tapped out" and would be interested in purchasing large amounts. Petitioner said he would call his wife Nidia to tell her that Matos and Vargas would be coming. Matos said that petitioner then went to the back of the bar for a few minutes and when he returned, said he had spoken to his wife and that they should speak to her about the money laundering and the purchase of cocaine. There were no further meetings or discussions with petitioner after this time.

Following the meeting with petitioner, Matos and Vargas left the bar and drove to the offices of Costa Rica Realty, where they met privately with Nidia. Nidia and Matos discussed how much money Matos needed to have laundered, as well as the amount of cocaine that Matos could import. Matos indicated that he wanted his money trans-

ferred to Spain, and Nidia responded that the fee for the transfer would be 10% of the cash transferred. Matos inquired whether this fee could be lowered and Nidia agreed to find out. Matos also told Nidia that he could bring in 500 kilos of cocaine every four or six weeks at a price of $10,000 per kilo, for a total of $5 million for 500 kilos. Nidia responded that this was a good price and that she was interested in making the purchase.

On July 6, Vargas advised Matos that Nidia could not lower the 10% money-transfer fee and that Nidia wanted to buy the 500 kilos of cocaine, but only had $3 million available. Matos declined to accept less than full payment for the cocaine.

In later July, Vargas reported that he now had two buyers who would divide the 500 kilos of cocaine. He also said that if the second buyer backed out, Nidia would take all of it. Vargas tried again to convince Matos to accept less than full payment from Nidia, telling him that Nidia was often fronted large amounts of cocaine by the Cali cartel in Colombia. A few days later, Vargas advised Matos that the second buyer had backed out but that Nidia would purchase the entire amount. Later that day, Matos showed Vargas a van containing 500 kilos of cocaine, which Vargas declared satisfactory and then went to see Nidia. He reported back, however, that Nidia now wanted the entire shipment on consignment because her cash was tied up in another large cocaine deal that Nidia's associate had negotiated. Matos again refused to deliver the cocaine without full payment.

After further negotiations and additional meetings, Vargas said that Nidia would purchase 25 kilos every three days until Matos' supply was exhausted. In consummating the first of these transactions on August 9, Vargas was arrested after providing Matos with $295,000 for the anticipated cocaine delivery.

## B. Post–Conviction Habeas Hearing

This Court held an evidentiary hearing to address petitioner's claim that at trial he was denied the right to testify when his trial counsel refused to permit him to take the stand. At the hearing, petitioner's trial

counsel, Barry Asness, testified and admitted that although petitioner had asked to testify at trial, he had refused to allow him to do so. Asness indicated that he viewed the decision as one he, and not petitioner would make, and that he, in effect, usurped petitioner's right to make the decision as to whether to testify. At the hearing, petitioner corroborated Asness' account of the conversations he and Asness had on the subject of testifying. Petitioner also stated that had he known that it was ultimately his choice to make, he would have testified.

Petitioner also explained what his testimony would have been at trial had he taken the stand. According to petitioner, he would have recounted that on June 21, 1989, Matos entered the bar with Vargas and advised petitioner that he needed him to pass a million dollars from Panama to Spain. Petitioner told Matos in response, "I don't do that." Matos then said that he needed someone to sell him a house in New Jersey and petitioner responded that his wife dealt in real estate and that she had an office half a block away from the bar. Matos then told petitioner to go call his wife to see if she was in the office, which he did. Petitioner would have denied that there was any discussion about cocaine at the bar meeting.

III. *Discussion*

**A. The Constitutional Right to Testify**

■ It is well settled that a criminal defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas,* 483 U.S. 44, 49–52, 107 S.Ct. 2704, 2707–2709, 97 L.Ed.2d 37 (1987). The precise dimensions of that right, however, have not been resolved by the Supreme Court or the Second Circuit. The majority of courts which have addressed the issue have concluded that the right is a fundamental constitutional right that is personal to the defendant and cannot be waived by counsel. *See, e.g., Foster v. Delo,* 11 F.3d 1451, 1457 (8th Cir.), *aff'd,* 39 F.3d 873 (8th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1719, 131 L.Ed.2d 578 (1995); *United States v. Teague,*

953 F.2d 1525, 1532 (11th Cir.) (en banc), *cert. denied,* 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992); *United States v. McMeans,* 927 F.2d 162, 163 (4th Cir.1991); *Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.), *cert. denied,* 498 U.S. 831, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990); *Wright v. Estelle,* 572 F.2d 1071 (5th Cir.) (en banc) *cert. denied,* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978); *DeLuca v. Lord,* 858 F.Supp. 1330, 1354 (S.D.N.Y.1994), *aff'd on other grounds,* 77 F.3d 578 (2d Cir.1996).[2] These holdings find support in *dicta* of the Supreme Court in *Rock* which noted that "[o]n numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right." 483 U.S. at 53 n. 10, 107 S.Ct. at 2710 n. 10. On one such occasion, the Court observed that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983).

■ The Court concurs with the analysis in the above cited precedent and concludes that the right to testify is a fundamental constitutional right, personal to the defendant that cannot be waived by counsel. In so doing, the Court recognizes that this result may seem at odds with the practical realities of a trial. Thus, logic suggests that the decision of whether or not a defendant should testify should rest in the usually more capable hands of counsel. It is counsel, after all, who is in a superior position to assess the strength of the case, the plausibility of the defendant's account, and the ability of the defendant to withstand cross-examination. Indeed it was the understanding of an experienced practitioner in this case that it was his decision to make. This view also finds support among some jurists. One appellate judge, in an opinion predating *Rock,* concluded that the decision as to whether a defendant should testify is properly allocated to

**2.** Some judges have differed. *See Teague,* 953 F.2d at 1536 (Edmonson, Cox, & Birch, JJ., concurring); *Wright v. Estelle,* 572 F.2d at 1073 (Thornberry, Clark, Roney, Gee, & Hill, JJ., specially concurring).

counsel. He summed up the deficiencies of a contrary rule leaving the decision to the client with the stark observation that there is no constitutional requirement that an attorney "must walk his client to the electric chair." *Wright v. Estelle,* 572 F.2d at 1074 (Thornberry, Clark, Roney, Gee, & Hill, JJ., specially concurring).

Although leaving the decision to counsel may seem logically sound, it does not withstand scrutiny in light of the constitutional analysis expressed in *Rock.* It is precisely because the defendant's freedom is at stake, that some decisions are left for the accused to make, informed by the advice of counsel. The exercise of the constitutional right to assistance of counsel does not extinguish the defendant's right to make certain fundamental decisions as to the case. Although the Supreme Court did not directly hold in *Rock* that the right to testify is fundamental and personal to the defendant, this conclusion inevitably flows from its reasoning and holding, as well as from the Court's prior precedent. The Supreme Court in *Rock* held that the right to testify is a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony." 483 U.S. at 52, 107 S.Ct. at 2709. Thus, the same logic which dictates that a criminal defendant may not be compelled to testify by defense counsel, also supports the conclusion that a defendant may not be compelled to remain silent by his or her attorney. *See Teague,* 953 F.2d at 1525.

This conclusion is also consistent with the standards of the American Bar Association, which emphasize that the testimonial decision is one for the client to make with the advice of counsel. *See* 1 Standards for Criminal Justice, Standard 4–5.2(a) (2d ed. 1980); Model Rules of Professional Conduct, Rule 1.2(a) (1983).

█ Although after *Rock* there is general agreement among courts that the right to testify is fundamental and personal to the defendant, courts differ on the appropriate constitutional framework to employ in analyzing a claim that counsel interfered with the right. Some courts analyze the claim as a Sixth Amendment deprivation of the right to effective assistance of counsel. This approach rests upon the assumption that it is the responsibility of defense counsel to advise the defendant of his right to testify and thus to ensure that the right is protected. *Foster v. Delo,* 11 F.3d at 1455; *Teague,* 953 F.2d at 1534; *see also DeLuca,* 858 F.Supp. at 1355. Other judges have analyzed the claim more broadly as a denial by counsel of a fundamental constitutional right. *See Jordan v. Hargett,* 34 F.3d 310, 312 (5th Cir. 1994) (opinion vacated)[3]; *Wright v. Estelle,* 572 F.2d at 1077–84 (Godbold, J. dissenting); *United States v. Butts,* 630 F.Supp. 1145, 1148–49 (D.Me.1986); *Underwood v. Clark,* 939 F.2d 473, 474–75 (7th Cir.1991) (dicta); *Rogers–Bey v. Lane,* 896 F.2d at 283 (dicta). These opinions emphasize that the right to testify is personal to the defendant, cannot be waived by counsel, and has as its source, rights in addition to the Sixth Amendment right to counsel.[4] *Jordan v. Hargett,* 34 F.3d at 316 n. 5; *Wright v. Estelle,* 572 F.2d at 1077–84; *Butts,* 630 F.Supp. at 1148–49. The Second Circuit has not yet had occasion to address this issue.[5]

---

**3.** The Fifth Circuit initially vacated the panel opinion and agreed to hear the case *en banc,* but because the attorney who had represented the petitioner had since been located, the case was remanded to the district court for further proceedings. *Jordan v. Hargett,* 53 F.3d 94 (1995).

**4.** The Supreme Court held in *Rock* that the right to testify is a necessary ingredient of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law, a right logically included in the accused's Sixth Amendment right to call witnesses whose testimony is material and favorable to the defense, and a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. 483 U.S. at 51–53, 107 S.Ct. at 2708–10.

**5.** In *DeLuca,* 858 F.Supp. at 1330, the district court granted the petitioner habeas relief on the grounds that defense counsel was ineffective in two respects: first, in failing to adequately develop a possible defense based on extreme emotional disturbance ("EED"); and second, in failing to advise petitioner that it was her decision whether to testify in her own defense. The Court of Appeals affirmed the district court's grant of habeas relief based upon defense counsel's inadequacies in not preparing and developing the EED defense, and therefore did not reach the right to testify issue. *DeLuca v. Lord,* 77 F.3d 578, 590 (2d Cir.1996).

The government argues that petitioner's claim should be analyzed as an ineffective assistance of counsel claim, while petitioner urges that his claim should be characterized as a fundamental rights violation.

Although the issue is not free from doubt, this Court concludes that the analysis employed by the Court in *Teague,* of approaching the claim as one of ineffective assistance is the most sound. This approach gives proper deference to the unique role played by counsel in the defendant's decision to testify. As the court observed in *Teague:* "because it is primarily the responsibility of defense counsel to advise the defendant of his right to testify and thereby to ensure that the right is protected, ... the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel." 953 F.2d at 1534.

### B. Petitioner Received Ineffective Assistance of Counsel

 To make a showing of ineffective assistance of counsel, petitioner must demonstrate that (1) counsel's "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). The Supreme Court has defined reasonable probability as "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* at 694, 104 S.Ct. at 2068. A court reviewing such a claim should indulge a strong presumption that counsel rendered reasonable professional assistance. *Id.* at 689, 104 S.Ct. at 2065. Applying the *Strickland* standard, courts have required a petitioner to "demonstrate that his counsel committed errors so serious that he was not functioning as counsel within the meaning of the Sixth Amendment and that counsel's performance was so deficient that he was de-

prived of a fair trial." *Foy v. United States,* 838 F.Supp. 38, 43 (E.D.N.Y.1993); *see also Cuevas v. Henderson,* 801 F.2d 586, 589 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987).

 The Court finds that the performance of petitioner's trial counsel fell "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner had the right to decide whether to testify, and counsel decided that it was he, and not petitioner, that would make this decision.[6] In this respect alone, counsel's conduct "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065; *Teague,* 953 F.2d at 1534 (if defense counsel refused to accept defendant's decision to testify or never informed defendant of his ultimate right to decide to testify, "defendant clearly has not received reasonably effective assistance of counsel"); *DeLuca v. Lord,* 858 F.Supp. at 1360–61 (counsel found ineffective for failure to inform defendant of her ultimate right to decide whether to testify).

Petitioner's trial counsel, Barry Asness, testified at the habeas hearing that on more than one occasion petitioner told his counsel that he would like to testify. Specifically, petitioner brought up the subject of his testifying immediately after Agent Matos had testified because petitioner disagreed with Agent Matos' version of events. Asness testified that when petitioner raised the issue, he told petitioner he would think about it and let petitioner know whether it was necessary. At some point later in the trial, petitioner told his counsel that he now wanted to testify. Asness told him that it would be a mistake.

Asness specifically testified, that at no time did he ever inform petitioner that it was petitioner's choice to testify. In fact, despite the case law cited herein and the clear directives of the American Bar Association's Standards of Criminal Justice and Model

6. Had trial counsel merely advised petitioner not to testify, and had petitioner accepted this advice, petitioner could not now claim that his counsel rendered ineffective assistance since such advice would have been considered a func-

tion of the defense trial strategy. In this case, trial counsel did more than just render advice that petitioner followed, he overrode petitioner's wishes and effectively precluded him from testifying.

Rules of Professional Conduct[7], defense counsel thought it was his, and not petitioner's decision to make. According to Asness:

I felt I was boss of this case.... He [petitioner] is not a very sophisticated man, certainly not sophisticated in the law.... I could not take his judgment as to what he wanted to do and have that be the ruling issue.... So I perhaps was overbearing in my zeal to protect him and to help him, and I did not value his judgment over my own. I didn't value his judgment very much at all, quite frankly. So in a desire to help him, I did not allow him to make that decision. I did not tell him he could overrule me.

Tr. at 19–20.[8]

Asness unequivocally stated that he believed it was his prerogative to make the decision as to whether petitioner would testify. When asked if the decision was made together with petitioner, Asness responded, "it was really my opinion, my decision. He said he wanted to testify, and I'm basically saying to him, it's a big mistake ... you shouldn't testify. Go away and don't bother me." (Tr. at 49).

The government argues that counsel was not ineffective because petitioner was aware of his ultimate right to testify. The government points to the fact that petitioner initially raised the issue with his trial counsel, and that after asking once, petitioner was aware that he might still testify. However, the issue here is not whether petitioner knew he had the right to testify, but whether he knew that ultimately it was his choice to make, not that of his attorney. The government concedes that Asness never advised petitioner that it was petitioner's choice to testify. As the testimony quoted above makes clear, even Asness, a highly experienced criminal defense attorney, did not think that in this case it was petitioner's prerogative to decide to testify.

Moreover, petitioner testified at the habeas hearing, that had Asness told him that it was ultimately his decision to decide whether to testify, that he would have taken the stand, ignoring the advice of his attorney. The Court finds the petitioner's testimony at the hearing on this point credible, i.e. that even in the face of his attorney's admonitions, petitioner, had he known it was his choice, "would have come to testify because I was anxious to speak ... because the accusations were very great." Under these factual circumstances, it is clear that petitioner received ineffective assistance of counsel.

■ Petitioner also suffered prejudice as a result of his counsel's failure to inform him that he had the ultimate right to testify. Petitioner testified at the habeas hearing that he would have taken the stand and told his version of his meeting with Matos. The government argues that petitioner was not prejudiced because his testimony would have been incredible and the outcome of the trial would have been unchanged. The government doubts that a jury would have believed petitioner because in order to do so the jury would have had to determine that Matos, an agent of the DEA, was lying. Moreover, the government argues that petitioner would not have been found credible by the jury because he would have testified that he did not know that his wife or his friend Vargas were involved in criminal activity.

The Court finds that there is at least a reasonable probability that but for counsel's unprofessional error, the result of the trial would have been different. The testimony against petitioner at his trial was not so strong as to render harmless petitioner's failure to testify. Agent Matos was the only witness to testify against petitioner, and his account was not directly corroborated by a tape recording or other evidence. Moreover, although petitioner's actions and statements as recounted by Agent Matos were sufficient evidence to convict, they evidenced at best a limited role in the charged offenses. Finally, petitioner's testimony would have directly contradicted that of Matos.

It is certainly true, as the government argues, that the jury would have had to believe petitioner, and not Matos, but the

---

**7.** *See* 1 Standards for Criminal Justice, Standard 4–5.2(a) (2d ed. 1980); Model Rules of Professional Conduct, Rule 1.2(a) (1983).

**8.** References with the prefix "TR" are to pages of the transcript of the habeas hearing on September 29, 1995.

Court cannot assume that a jury would have rejected petitioner's testimony. At trial, Matos' testimony was obviously believed, but it stood uncontradicted. The jury may have viewed the case differently if Campos had testified. The government argues that Matos, as a DEA agent, would have been more credible, but the Court's instruction advised the jury that his status as an agent did not make him more or less credible than any other witness. Petitioner's purported testimony was not so fanciful or belied by other evidence that a reasonable juror could not have believed it.

Petitioner had a right to tell his side of the story, but his attorney did not allow him to do so. Had the jury heard petitioner's version of the meeting with Matos, its verdict may very well have been different. Often in criminal cases, "the most important witness for the defense ... is the defendant himself." *Rock v. Arkansas*, 483 U.S. at 52, 107 S.Ct. at 2709. The Court finds that it is at least reasonably probable that had petitioner testified, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. "The testimony of a criminal defendant at his own trial is unique and inherently significant. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Nichols v. Butler*, 953 F.2d 1550, 1553 (11th Cir.1992) (quoting *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961)). Under the facts of this case, the Court holds that petitioner received ineffective assistance of counsel.

IV. *Conclusion*

For the reasons set forth above, Mario Campos' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 is granted and his conviction is set aside. Campos is entitled to a new trial. The government is directed to submit a writ to the Court to secure Campos' presence at a status conference on this matter on June 25, 1996 at 4:30 p.m.

SO ORDERED.