Opinion issued November 19, 2009

 

 

 

 

 



 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00941-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ULYSSES LOVE, Appellant

 

V.

 

THE STATE OF TEXAS,
Appellee

 

 



On Appeal from the 248th District Court

Harris County, Texas

Trial Court Cause No. 1122222

 

 



MEMORANDUM OPINION

           A jury convicted Ulysses Love of indecency
with a child.  Tex. Penal Code Ann. § 22.011(a)(2) (Vernon Supp. 2009).  The trial court then sentenced Love to five
years’ confinement pursuant to an agreement between the State and defense
counsel.  Love appeals, contending in
three issues that (1) he was denied due process when the trial court sustained
the State’s objections to testimony relating to the truthfulness of the
complainant; (2) he was denied due process because the trial court refused
access to a document provided to and reviewed by a forensic interviewer prior
to her testimony; and (3) his counsel rendered ineffective assistance by opening
the door to an extraneous sexual assault offense.  We affirm.

Background

Child Protective Services (CPS)
placed Love’s daughter, M.G.L., with Love when she was nine years old.  Love was very dedicated to his daughter’s
academic success and told school officials that, for his daughter, failure was
not an option.  Love prided himself on
being a strict disciplinarian and punished M.G.L. if her grades did not meet
his standards.  In November 2006, when
M.G.L. was twelve years old and in the sixth grade, she and Love had a dispute
over her school progress report.  Love
disciplined M.G.L. and took her to school. 
During her before-school care, M.G.L. wrote a letter to a teacher stating
that her father whipped her, made her squat against the wall, slapped her, and stepped
on her face with his boot.  As a
postscript, M.G.L. wrote that her father also touched her inappropriately.  After a teacher read the letter, M.G.L. spoke
with the school’s magnet coordinator and a counselor before CPS removed her
from school and placed her in custody.

M.G.L. testified that she began
living with Love when she was nine, after CPS removed her from both her
mother’s care, because her mother was an alcoholic, and her uncle’s care,
because a cousin had sexually abused her. 
According to M.G.L., she did not want to live with Love because he
disciplined her and whipped her if she did wrong, and her mother told her to
lie to CPS and say that Love “did something he didn’t” to get out of living
with him, but M.G.L. refused.  M.G.L.
testified that after she moved in with Love, he began to act
inappropriately.  Once, he asked her to
give him a hug and then pulled her onto his lap, so that she was straddling him
face forward and their private parts were touching through clothing, and held
her here.  Another time, he came to her
bedroom while she was in bed and got on top of her and began moving in a
circular motion while their private parts were touching through clothing.  Additionally, M.G.L. testified that once Love
required her to remove her panties and bend forward over his bed and then she felt
something hard press into her buttock. 
Another time, as a punishment, M.G.L. said Love made her remove all of her
clothes except her socks and watch a pornographic DVD and drink wine coolers,
but he did not touch her at that time. 
Love also engaged in other forms of discipline, including whipping with
a belt and forcing M.G.L. to either squat against a wall for long periods of
time or stand on one foot while holding books in each hand.  On the morning she handed the note to a
teacher, he had whipped her and placed his boot on her face as she was lying on
the floor.  M.G.L. testified that she
never told anyone about any of the sexual contact because she was ashamed and
afraid, and she tried not to think about what her father did to her because it
made her cry.  She also testified that
Love never told her why he touched her inappropriately, but once he did tell
her that when she got older, if someone tried to rape her, it would affect her
more than what he did to her.

Susan Odhiambo, a forensic interviewer
with the Children’s Assessment Center, interviewed M.G.L. after CPS took her
into custody in November 2006.  She
testified that, when she interviewed M.G.L., M.G.L. knew the difference between
the truth and a lie and promised to tell only the truth.  Odhiambo’s testimony about M.G.L.’s interview
was similar to M.G.L.’s testimony about what happened.

Dr. Michelle Lyn, who examined M.G.L.
at the Children’s Assessment Center in February 2007, testified that M.G.L.
told her that her father had touched her vagina with his hand or his private
part three to four times per year when she was in the third, fifth, and sixth
grades.  M.G.L. did not tell her about
any physical abuse or punishment.  Dr.
Lyn testified that M.G.L. appeared normal in her physical exam with no signs of
scratching, bruising, or tearing, which neither rules out nor confirms sexual
abuse.  Dr. Lyn further testified that
approximately ninety percent of children who have made allegations of sexual
abuse also have normal exams and that the best evidence of sexual abuse is the
child’s disclosure.

Liz Allen, M.G.L.’s fourth grade
teacher, testified on Love’s behalf.  She
testified that she never saw any marks, bruises, or signs of abuse on M.G.L.  She also believed that she and M.G.L. had a
close relationship, but M.G.L. never told her about any kind of abuse.  Dorothy Fletcher, who, with her husband,
employed Love at a car wash, also testified on his behalf.  She testified that she had a close
relationship with M.G.L. and Love, and she never saw any signs of abuse on
M.G.L.  She further testified that (1) she
did not believe Love could ever abuse his daughter; (2) M.G.L. had lied to her “very
often” in the past; and (3) she believed that she and M.G.L. had an open
relationship in which M.G.L. would have told her about problems such as her
father abusing her.  Gerald Fletcher,
Dorothy’s husband, testified that he and Dorothy saw M.G.L. mostly when she was
younger because Dorothy became ill, and they were not able to spend as much
time around the car wash where they usually saw M.G.L.  Gerald had never seen any signs of abuse on
M.G.L., and he had never observed Love abusing M.G.L. on the car wash
surveillance tapes, which he watched regularly.

Sonya Hereford, M.G.L.’s CPS
caseworker, testified that M.G.L. was always consistent in what she said that Love
did to her.  Hereford visited M.G.L. in
foster care during the entire year after CPS removed her from her father’s home.  M.G.L. told Hereford that she did not want to see her
father, but she wanted him to apologize to her. 
Hereford further testified that, while M.G.L. was in foster care, she
was very sad that none of her family members contacted her, but she never
changed her story about what her father had done.

Love called
Provilla Henderson Scruggs, who engaged in individual and family therapy
sessions with M.G.L. and Love both before and after CPS placed M.G.L. with
Love, and who ultimately approved M.G.L.’s placement there.  On direct examination, defense counsel
attempted to elicit from Scruggs that she had no concerns about M.G.L.’s living
situation with Love after she was placed. 
He asked her if she would have voiced a concern that M.G.L.’s placement
with Love was not in M.G.L.’s best interest if she had such a concern.  Scruggs replied that she had one concern
about M.G.L.’s potential placement with Love after she learned of allegations
that Love was previously involved in another sexual assault.  Scruggs learned of this before CPS placed
M.G.L. with Love.  Defense counsel
objected to Scruggs’s testimony revealing the prior sexual assault allegation
on the basis that it was non-responsive and violated a motion in limine, but
the trial court held that Scruggs’s answer was responsive to the question
defense counsel asked.  Defense counsel
moved to disregard the question but the trial court held that Scruggs had
already answered it.  Before
cross-examination, the State asked permission to inquire into the prior sexual
assault allegation because defense counsel had opened the door to the existence
of the allegation.  At a bench conference,
the trial judge explained the bounds of what she would allow the State to
elicit on cross-examination about Scruggs’s concerns, ruling that Scruggs could
testify that she had a concern about the placement but could not go into detail
about that concern.

On cross-examination,
the State asked Scruggs if she had any concerns about Love’s ability to keep
M.G.L. safe in his home environment with his girlfriend, Brenda Campbell.  Scruggs responded that she did, and the State
asked what information gave rise to Scruggs’s concerns.  Scruggs said that she was concerned about (1)
M.G.L.’s physical safety based on allegations that Campbell spanked her, (2)
Love and Campbell’s ability to monitor other children in the home and make sure
the environment was safe, (3) allegations of domestic conflict or violence
between Love and Campbell, and (4) M.G.L. may have mentioned the use of alcohol
or marijuana in Love and Campbell’s home. 
Defense counsel did not object to any of this testimony.  The State then asked Scruggs what other
concerns she had based on Love’s history, and Scruggs testified in greater
detail about the prior sexual assault allegations against Love, exceeding the
parameters that had been set by the trial court.  Defense counsel objected three times during
this testimony, and the trial court sustained one but overruled two of the
objections.  At the close of Scruggs’s
testimony, defense counsel moved for a mistrial on the basis that the State
violated the trial court’s limine ruling, prejudicing Love’s rights.  The trial court overruled this motion, saying
that, in her opinion, defense counsel opened the door by calling Scruggs to the
witness stand.

          Love
then testified in his own defense.  Love stated
that he learned that M.G.L. was his daughter when she was five years old, but
he had been involved in her life before that as her godfather.  M.G.L. came to live with him when she was in
the third grade after CPS had removed her from both her mother’s and her
uncle’s custody.  When M.G.L. first came
to Love’s home, he lived with Brenda Campbell and Campbell’s two grandchildren,
but Campbell moved out of the house when M.G.L. was between fourth and fifth
grade because, according to Love, she thought Love let M.G.L. get away with
anything.  Love said that after M.G.L.
failed kindergarten, he became involved in teaching M.G.L. things, such as
numbers and the alphabet, even before she came to live with him.  When she came to live with him, she got
straight A’s in the third, fourth, and fifth grades, and did not have any
problems until she began middle school in the sixth grade.

          Love
testified that his method of discipline was whipping with a belt, and he would
whip M.G.L. for bad grades.  He would also
make her squat against the wall as a punishment to avoid whipping her.  Love testified that, on the morning that
M.G.L. gave the teacher her note, he had whipped her because she did not give
him her report card for the first six weeks of school, and when he got the
report card for the second six weeks, he saw her failing grades from the first
six weeks.  Love testified that he had never
slapped or kicked M.G.L., put his boot on her face, made her sit on his lap and
give him a hug, rubbed his genitals on her, forced her to drink alcohol and
watch pornography, or lain in her bed. 
On cross-examination, Love testified that he believed he was responsible
for M.G.L.’s academic success.  He said
that he was a strict parent, but he did not believe that he was mean to M.G.L.
or that she was afraid of him.  He
testified that he never sexually abused M.G.L. and never touched M.G.L. “or no other
[sic] child.”  Love agreed that, if true,
what M.G.L. described was absolutely sexual abuse, but he argued that what she
said was not true.

          Brenda
Campbell testified that when M.G.L. came to live with Love, the three of them
lived together without any other children, but she also had her own apartment
where her grandchildren lived with her and they occasionally visited Love’s
home.  She testified that Love drank beer
and not wine coolers.  Finally, she
testified that she moved out of the house with Love and M.G.L. because M.G.L.
lied to her.  She testified that M.G.L.
did not lie all the time, but did lie unnecessarily.  Campbell,
however, testified that she did not know if M.G.L. was telling the truth about
the sexual abuse allegations, and that if M.G.L. had come to her with those
allegations, she would have believed M.G.L. because one believes children when
they make those kinds of accusations.

          After
the defense rested, the State called a witness to testify about Love’s
extraneous offense of sexually assaulting another child, to counter Love’s
statement that he had never touched M.G.L. or any other child, which the State
contended opened the door to the extraneous offense.  Defense counsel objected on Rule 403 grounds,
alleging that the evidence would be more prejudicial than it would be probative.  The trial court allowed this testimony.  The State called Shameka Specks, Brenda
Campbell’s twenty-eight-year-old daughter, who testified that she met Love when
she was six or seven and her mother and Love began dating.  Specks testified that she grew up around Love
and that he favored her over her other siblings.  One night when Specks was eleven, Love took
her with him to run an errand and then to his apartment where he tried to rape
her.  Campbell took Specks to the
hospital after she found out about the incident, and the police became
involved, but Specks eventually dropped the charges because she was afraid of
what Love might do to her or her family, and she was tired of her mother being
sad about it.  Specks testified that,
although she knew M.G.L., she never told M.G.L. that Love had assaulted her.

          The
jury found Love guilty of indecency with a child.  The State and defense counsel then agreed on
a punishment of five years’ confinement, and the trial court sentenced Love to
this punishment.

Discussion

M.G.L.’s Truthfulness

          Love
first contends that he was denied due process when the trial court sustained
the State’s objections to his counsel’s questions about M.G.L.’s
truthfulness.  Specifically, Love
contends that the trial court sustained objections to testimony about M.G.L.’s
truthfulness, or lack thereof, during the testimony of Odhiambo, Allen, and
Fletcher.

          We
review a trial court’s decision to admit or exclude evidence for an abuse of
discretion.  Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  A reviewing court
should not reverse unless the record shows a clear abuse of discretion.
Id.;
Roberts v. State, 29 S.W.3d 596, 600
(Tex. App.—Houston
[1st Dist.] 2000, pet. ref’d).  An abuse of discretion exists only when the trial judge’s decision was so
clearly wrong as to lie outside that zone within which reasonable persons might
disagree.  Zuliani, 97 S.W.3d at 595; Roberts,
29 S.W.3d at 600.

          Both
Allen and Fletcher commented on M.G.L.’s truthfulness before the State
objected.  Defense counsel asked Allen if
she observed any problems in her relationship with M.G.L.  Allen answered, “No, other than when she
didn’t tell the truth, well, [Love] would come to school and check on it.  And I would try and convince her to always
tell the truth.  You know, you avoid
problems if you’re truthful, but in some instances, she was not.  I can remember. . . .”  The State then interrupted Allen by
objecting, and the trial court sustained the objection.  The State objected to Allen’s testimony
regarding a specific instance of M.G.L.’s untruthfulness, not her testimony
about M.G.L.’s general propensity for truthfulness.  A witness’s character for truthfulness cannot
be attacked on cross-examination or by extrinsic evidence concerning specific
instances of untruthfulness.  See Tex.
R. Evid. 608(b) (“Specific instances of the conduct of a witness, for
the purpose of attacking or supporting the witness’
credibility . . . may not be inquired into on
cross-examination of the witness nor proved by extrinsic evidence.”); see also Billodeau v. State, 277 S.W.3d
34, 39–40 (Tex. Crim. App. 2009).  The
trial court, therefore, correctly sustained the State’s objection to Allen’s
testimony regarding a specific instance of M.G.L.’s untruthfulness.  Love contends that the trial court also erred
later in the testimony when Allen was prevented from explaining why she did not
believe M.G.L.’s allegations.  The trial
court, however, never ruled on the State’s objection, because defense counsel abandoned
the question after the State objected to its relevance.

Love also contends that Fletcher was
prevented from testifying as to whether M.G.L. told the truth because the trial
court sustained the State’s objection.  Such
an exchange, however, does not appear in the trial record.[1]  Rather, Fletcher testified without objection
regarding M.G.L.’s truthfulness.  On
cross-examination, the State asked, “[S]o you’re saying in your opinion there
is no way that Mr. Love can be guilty of indecency with a child?”  Fletcher responded, “No, because I know
[M.G.L.,] and I know what [M.G.L.] was able to do.  I know her lies.  I could tell lie from the truth[,] and[,]
very often, she did lie to me[,] and I would know she was. . . .”  The State did not object to Fletcher’s
testimony, but instead interrupted Fletcher by asking another question.  Later, in response to a question from the
State about how Fletcher only heard information about the case from Love and
had not heard M.G.L.’s “side of the story,” Fletcher stated that “there is a
question [about the truthfulness of the allegations] because she lied to me so
often.”  The State did not object.

The State did not request a limiting
instruction after its objection to Allen’s testimony about M.G.L.’s
truthfulness, and the trial court sustained no objections to Fletcher’s
testimony about M.G.L.’s truthfulness. 
Furthermore, Campbell testified that
M.G.L. “liked to lie” and “used to lie” so much so that Campbell cited it as her reason for moving
out of Love’s house.  Thus, Love has
failed to present any error for our review as to these witnesses.[2]

With respect to Odhiambo, the trial
court sustained the State’s objection when defense counsel asked Odhiambo if
she felt like M.G.L. was being truthful in her forensic interview.  The trial court, however, did not abuse its
discretion in excluding an expert opinion about the truthfulness of a child
complainant’s allegation.  Yount v. State, 872 S.W.2d 706, 708, 710–12
(Tex. Crim. App. 1993) (“We hold that Rule 702 does not permit an expert to
give an opinion that the complainant or a class of persons to which the
complainant belongs is truthful.”); see also
Miller v. State, 757 S.W.2d 880, 883 (Tex. App.—Dallas 1988, pet. ref’d)
(holding that trial court erred in allowing State to elicit forensic
interviewer’s opinion on whether child’s report of sexual assault was truthful).

Access to Document Reviewed by Forensic Interviewer

          Love
next complains that the trial court did not allow him to see a copy of a
document that Odhiambo reviewed in advance of her testimony.  Defense counsel asked Odhiambo whether she
had “reviewed any kind of written report” before testifying at trial.  Odhiambo responded in the affirmative, and
stated that she had received “[a] transcript sent by the prosecutor.”  Defense counsel did not further develop this
testimony with additional questions about the nature or contents of the
“transcript,” nor did defense counsel establish through cross-examination when Odhiambo
reviewed the document and whether that review refreshed her memory.  Instead, defense counsel simply asked to see
a copy of the document, the State responded that it was work product, and on
the basis of the State’s representation, the trial court did not require that
it be produced to defense counsel.

          When
a witness uses a writing to refresh her memory before testifying in a criminal
case, an adverse party is entitled to have the writing produced at the hearing,
to inspect it, to cross-examine the witness about it, and to introduce into evidence
the portions which relate to the witness’s testimony.  Tex.
R. Evid. 612.  Even if the
transcript given to Odhiambo falls under the protection of the work product
privilege, privileged documents must be produced for inspection when used by a
witness on the stand to refresh her memory. 
See Franklin v. State, 986 S.W.2d 349, 355 (Tex. App.—Texarkana 1999), rev’d on other grounds, 12 S.W.3d 473
(Tex. Crim. App. 2000).  Here, although
Odhiambo said that she reviewed a document prior to trial, there is no evidence
of specifically when she reviewed it or whether she used it to refresh her
memory.  The Court of Criminal Appeals
addressed this issue in Pondexter v.
State, when it held that the appellant was only entitled to the
prosecutor’s notes taken during voir dire if the prosecutor actually used the
notes to refresh his memory when he later testified.  942 S.W.2d 577, 582 (Tex. Crim. App. 1996); see also Saldivar v. State, 980 S.W.2d
475, 497 (Tex. App.—Houston
[14th Dist.] 1998, pet. ref’d) (holding that when witness never stated that he
used business records to refresh his memory, trial court did not err in denying
appellant’s request for records).

Odhiambo testified that she reviewed
a document sent to her by the prosecutor, she was unaware of the length of the
document and how long it took her to read it, and she spoke with the District
Attorney’s office about her testimony prior to reading the document.  However, defense counsel did not inquire about
the nature of the document or whether Odhaimbo had used it to refresh her
memory or relied on it for her opinions.[3]  Reliance on the material to refresh
recollection or to form a basis for the witnesses’ opinions is a prerequisite
to disclosure of such materials.  See Saldivar, 980 S.W.2d at 497.  Thus, we hold that the trial court did not
abuse its discretion in denying defense counsel’s request for the document or
in failing to require the State to produce the document for in camera
inspection.  Love argues that the trial
court erred in not reviewing the document in camera to determine Love’s
entitlement to the document.  Although we
hold that Love’s argument based on Rule 612 ultimately fails since Love never
established that Odhiambo used the document to refresh her memory, we also note
that Love failed to make an offer of proof concerning the document.  Without the inclusion of the document in the
record, we cannot determine whether the trial court committed harmful error by
refusing to allow the defense to review the document.  See
Franklin, 986 S.W.2d at 355.

Ineffective Assistance of Counsel

Love argues
that defense counsel rendered ineffective assistance because he opened the door
to testimony about Love’s prior sexual assault charge during both Scruggs’s
testimony and Love’s own testimony.  To
prevail on a claim of ineffective assistance of counsel, the defendant must
show that (1) his counsel’s performance was deficient and (2) a reasonable
probability exists that the result of the proceeding would have been
different.  Strickland v. Washington,
466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). 
The first prong of Strickland requires the defendant
to show that counsel’s performance fell below an objective standard of
reasonableness.  Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  Thus, the defendant must prove objectively, by
a preponderance of the evidence, that his counsel’s representation fell below
professional standards.  Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App.
2002).  The second prong requires the
defendant to show a reasonable probability that, but for counsel’s
unprofessional errors, the result of the proceeding would have been different.  See
Strickland, 466 U.S.
at 694, 104 S. Ct.
at 2068; see also Thompson, 9 S.W.3d
at 812.  In reviewing counsel’s
performance, we look to the totality of the representation to determine the
effectiveness of counsel, indulging a strong presumption that the attorney’s
performance falls within the wide range of reasonable professional assistance
or trial strategy.  Thompson, 9 S.W.3d at 813. 
Furthermore, a claim of ineffective assistance must be firmly supported
in the record.  Id.
(citing McFarland v. State, 928 S.W.2d
482, 500 (Tex. Crim. App. 1996)).  Where
the record does not offer an explanation for trial counsel’s actions, we
presume that counsel made all significant decisions in the exercise of
reasonable professional judgment.  Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); Broussard v. State, 68 S.W.3d 197, 199 (Tex.
App.—Houston
[1st Dist.] 2002, pet. ref’d).

The trial
court granted a motion in limine excluding evidence of the prior sexual assault
allegations against Love.  Defense
counsel had the following exchange with Scruggs:

Defense: You
didn’t forward anything to CPS or anyone else after the child was placed
raising any concerns?

 

Scruggs: After
the child was placed from whom, may I ask?

 

Defense:      In
Mr. Love’s custody.

 

Scruggs: I don’t
recall that at all.  I would have to
just—it’s, like I said, six years.  I
haven’t reviewed all these records to refresh my memory, and I don’t want to
say that I did—I didn’t or I did.

 

Defense: Did
you—so that would be the same thing as far as asking you if you had a concern
about the placement of [sic] Mr. Love by the court was not in her best
interest.  You would have voiced that?

 

Scruggs: I had
one concern about placement with Mr. Love after there were allegations that had
not been validated on—about an alleged previous sexual assault and I wanted
CPS—I made—

 

Defense: Objection,
nonresponsive.  We’re talking about after
she was placed.

 

The trial court ruled that defense
counsel’s question was not about after M.G.L. was placed but whether Scruggs
had any concerns generally, and Scruggs’s answer was responsive to that
question.  Defense counsel then requested
that the jury be instructed to disregard the question because it was not the
question he was intending to ask, and he did not want to breach the motion in
limine.  But the trial court observed
that Scruggs had already answered the question and gave no instruction.  Before cross, the State asked to question the
witness further about the extraneous complaint because defense counsel had
opened the door.  The trial court then
ruled:

This
is what I’m going to do.  I will allow
you to, because I think that was the thrust of what the purpose of this witness
was counseling, everything was fine, everything was good[,] and there weren’t
concerns.  That’s why she got placed and
that was the thrust and the fact of the matter is, apparently, there is
unresolved complaint against him and it did cause concern.  So I will allow you to go into that. . . . I
will allow you to ask if there were concerns but not to go into—it wouldn’t
matter who the person was, the age of the person, if there was an unresolved . . . complaint—and
the only reason you’re going to want to go into sexual is to support that this
is true.  That’s not—that’s not the purpose
of what I’m going to allow you to go through this with.  Not that he was a glowing character and that
she was happy to put him there, but she did have a real concern and—but it
shouldn’t matter what the real concern is. 
It can be a serious allegation. . . . Okay this is
what I’m going to let you do.  I’m not
going to allow you to ask—and I don’t want the answer that it was a sexual
concern, but there had been a concern of the complaint concerning the safety of
whoever the child is.  It shouldn’t matter
for the purpose of rebutting what he was trying to say, whether it was a sexual
complaint, a physical complaint, a mental complaint, the rebuttal is sufficient
if it says that she’s concerned about there was a complaint, that there were
some problems with—I mean, I don’t know what her concern is, so I’m not trying
to tell her what the concern is and involved whatever somebody
did. . . . I’m going to let that answer come in and I’m not
going to let you go into any details, but the thrust of her testimony was that
she had counseled and been approved and I will allow that in to rebut what the
thrust of that testimony was.  All right.

 

The State proceeded to cross-examine
Scruggs.  Scruggs cited several concerns
about the safety of the home environment, potential domestic violence, and
physical discipline, to which defense counsel did not object.  The testimony continued:

Scruggs:  I explored
with Mr. Love his relationship with his children from a previous marriage.

 

State:     Were
you aware an open investigation was not resolved at that point?

 

Scruggs: I can’t
remember.  I can’t really remember
that.  In regards to what?

 

State:     Well,
in your notes you had written that you had concerns about an open sexual
assault investigation.

 

Scruggs: Yes, I
was definitely concerned about that.

 

Defense: I’m going to object to leading her.  That goes against what the limine was.

 

Trial Court: Don’t
lead the witness.

 

Defense: And it’s
also a violation of what we talked about asking her as opposed to suggest.

 

Trial Court: It’s
overruled.

 

State:     Your
Honor, this is cross-examination.

 

Trial Court: You
can finish.

 

State (to Scruggs):         So
you were aware of an open sexual abuse allegation?

 

Defense: Judge,
I’m going to object, once again, to—

 

Trial Court: Don’t
lead the witness, counsel.

 

Defense: In the
boundaries you set about going into it.

 

Trial Court: That’s
sustained.  You made your point,
counsel.  You may continue.

 

State (to Scruggs):         Did
that concern you with Brenda Campbell as well because of her relationship?

 

Scruggs: I was
concerned about, in terms of Brenda Campbell, that there were allegations that
Mr. Love had sexually abused one of her daughters and that—

 

Defense:      I’m
going to object to the witness going into things that you set as a boundary.

 

Trial Court: That’s
overruled.  You may go ahead.

 

Scruggs: I was
concerned with Mr. Love moving in with—buying a house with Brenda Love [sic]
and there were allegations out there that Mr. Love had sexually abused one of
Brenda Campbell’s children.  And there
was another problem that occurred in regards to that because there was a CPS
case open up on Ms. Campbell whereas CPS wouldn’t allow the kids to be placed
with Ms. Campbell because of the allegations of sexual assault against Mr.
Love.

 

At the close of Scruggs’s testimony,
defense counsel moved for a mistrial on the basis that the State violated the motion
in limine and the parameters that the trial court set for going into the motion
in limine evidence.  The trial court
denied the motion.

Defense
counsel asked Scruggs a question that was targeted at whether she had any concerns
after M.G.L. began living with Love.  He
pursued his objection to Scruggs’s answer and obtained a favorable ruling from
the trial court on the boundaries of Scruggs’s testimony on
cross-examination.  The trial judge then reversed
her ruling during cross-examination.  Defense
counsel, therefore, did not open the door to the information that Scruggs
revealed on cross-examination or perform deficiently.  To the extent the trial court erred in her
rulings, Love does not appeal those rulings. 
We note, however, that Scruggs’s testimony is cumulative of other
evidence elicited later in the trial about the complaint from Specks, who
alleged that Love attempted to sexually assault her when she lived in the home.

Love further
complains that even calling Scruggs as a witness at all constitutes ineffective
assistance of counsel.  The Court of
Criminal Appeals has held that an “undoubtedly risky” trial strategy that
ultimately does not pay off is not necessarily unacceptable or “wholly
unjustified.”  See Delrio v. State, 840 S.W.2d 443, 446–47 (Tex. Crim. App. 1992)
(per curiam).  Defense counsel risked the
possibility that Scruggs would testify about her concerns regarding placing
M.G.L. with Love.  However, Scruggs also
provided favorable testimony about Love’s compliance with CPS’s requirements
for obtaining custody of M.G.L. and the fact that she did not have any concerns
after CPS placed M.G.L. with Love. 
Defense counsel took a risk in calling Scruggs as a witness.  Just because that strategy did not pay off in
the way counsel intended does not mean counsel rendered ineffective assistance.  Love did not move for new trial; thus, the
record is silent on defense counsel’s reasoning for calling Scruggs.  If the trial record is silent as to the
reasons defense counsel called a witness or pursued a line of questioning that
opened the door, we cannot conclude that defense counsel’s decision falls below
an objective standard of reasonableness. 
See Johnson v. State, 137
S.W.3d 777, 779 (Tex.
App.—Waco 2004, pet. ref’d) (holding that when record does not disclose counsel’s
reasoning behind questioning defendant about juvenile boot camp experiences, which
opened door to State’s cross-examination on juvenile criminal history, court
could not conclude counsel’s performance fell below objective standard of
reasonableness).

Love further
contends that defense counsel rendered ineffective assistance because he
inadequately prepared Love for testifying, as evidenced by Love’s testimony
that he had never assaulted M.G.L. “or no other [sic] child,” which opened the
door for the State to call Specks to testify about her allegations.  Love relies on Perrero v. State, 990 S.W.2d 896, 899 (Tex. App.—El Paso 1999, pet. ref’d), for the
proposition that an attorney may be ineffective for failing to prepare a client
to testify by not warning him that he could open the door to his prior criminal
history.  Unlike here, the Perrero trial court held a hearing on
the defendant’s motion for new trial, at which defense counsel testified that
he believed that he was negligent in not preparing Perrero to avoid opening the
door to his prior criminal history during his testimony.  Id.  Love, however, presents no evidence to
substantiate his argument that counsel did not advise him of the possible
consequences of testifying, including the possibility that it could open the
door to evidence of other criminal conduct, and no support exists in the trial
record.  The right to testify is personal
to the defendant.  Johnson v. State, 169 S.W.3d 223, 232, 235 (Tex.
Crim. App. 2005) (citing Rock v. Arkansas,
483 U.S. 44, 52, 107 S. Ct. 2704, 2709 (1987)).  The defendant possesses the ultimate
authority to decide whether to invoke the right.  Id. at 236.  Love chose to invoke that right, and nothing
in the record on direct appeal supports a claim that defense counsel failed to
prepare him for his testimony or warn him of the consequences of testifying on
his own behalf.  Without a record on
these matters, nothing supports a conclusion that counsel’s representation fell
below a reasonable professional standard.

Conclusion

We affirm the judgment of the trial
court.

 

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice Radack
and Justices Bland and Massengale.

Do Not Publish.  Tex.
R. App. P. 47.2(b).











[1] In Love’s brief, counsel cites to a question where
defense counsel asked about Fletcher and M.G.L.’s relationship and asked if
M.G.L. could “trust telling [Fletcher] things.” 
Defense counsel was not asking whether Mrs. Fletcher could trust what
M.G.L. told her, but whether M.G.L. trusted Fletcher enough to tell her
things.  Fletcher responded, “Oh, yes.”





[2] Love also argues that the State opened the door to
evaluating M.G.L.’s truthfulness by saying during opening statements that she
was telling the truth.  Love relies on Bass v. State, 270 S.W.3d 557 (Tex.
Crim. App. 2008), for this contention. 
In Bass, the Court of Criminal
Appeals held that a defense opening statement may open the door to the
admission of extraneous-offense evidence to rebut a defensive theory expressed in
opening statement.  Id. at 558.  The opening
statement in Bass made a broad
allegation that the complainant’s allegations were “pure fantasy” and “pure
fabrication” and “contrary to [appellant’s] character.”  Id.  Love argues that, here, the State’s
opening statement that the jury would hear the truth was not materially
different than Bass’s opening statement that the complainant was lying.  We need not address this contention because both
Fletcher and Campbell testified about M.G.L.’s propensity for truthfulness
without an objection from the State.





[3] Texas Rule of Evidence 705 provides that an expert
may be required to disclose any underlying facts or data that form the basis of
her opinion.