The STATE of Texas, Appellant,

v.

Carolyn Sue KRIZAN–WILSON,
Appellee.

No. 14–09–00475–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 22, 2010.

Rehearing Overruled Sept. 23, 2010.

**620**

Peyton Peebles III, Houston, for appellant.

Jessica Akins McDonald, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

## OPINION

ADELE HEDGES, Chief Justice.

Appellee, Carolyn Sue Krizan–Wilson, was indicted on July 14, 2008 for the murder of her husband, Roy McCaleb, who had been killed on September 22, 1985. Appellee filed a motion to dismiss the indictment based on the nearly twenty-three year prosecutorial delay between the alleged offense and the filing of charges. The trial court granted the motion and dismissed the case. The State of Texas now appeals the order of dismissal. We reverse the trial court's order and remand for further proceedings in accordance with this opinion.

## I. Background

In her motion to dismiss the indictment and in a subsequent hearing on the motion, appellee asserted that the State's delay in bringing charges violated her right to due process as guaranteed under the Fifth Amendment to the United States Constitution. Appellee additionally argued that the pre-indictment delay violated her rights to (1) a speedy trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, article I, section 10 of the Texas Constitution, and article 1.05 of the Texas Code of Criminal Procedure; (2) due course of law under article I, section 19 of the Texas Constitution; (3) a fair trial pursuant to the Sixth Amendment; and (4) testify and present a defense, as guaranteed by the Fifth and Sixth Amendments, article 1, sections 10

and 19 of the Texas Constitution, and the Texas Code of Criminal Procedure. Appellee finally asserted that the indictment was barred by the doctrine of laches. The trial court suggested sua sponte that the delay may have violated her right to effective representation under the Sixth Amendment and article I, section 10 of the Texas Constitution. Except for the speedy trial ground, the trial court entered findings of fact and conclusions of law in support of each of these grounds for dismissal.

Numerous witnesses were called by each side during the hearing on the motion to dismiss. Waymon Allen, a private investigator hired by appellee's current counsel, testified that in 1985, appellee had hired attorney Clarence Thompson to represent her. Thompson died in 1988, and Allen testified that his attempts to locate Thompson's files relating to appellee were unsuccessful. Allen additionally stated that Thompson had hired Rafael Gonzalez as an investigator in the case. Gonzalez did not now recall the case, and the evidence Gonzalez turned over to Thompson had been lost. Thompson had also hired a forensic examiner, Floyd McDonald, who is also now deceased. Allen, the current investigator, recounted that around the time of her husband's murder, appellee made outcry statements that she had been sexually assaulted ten days before the murder. It was a theory of the defense that the rapist later returned and murdered Roy McCaleb. The vehicle in which the sexual assault allegedly occurred apparently had never been processed for evidence by the Houston Police Department ("HPD") and presumably was no longer available for such processing. Allen reported that records pertaining to appellee's outcry to a fellow employee were unavailable.

Allen testified that medical records were also not available regarding a worker's compensation claim McCaleb made not long before his death. According to Allen, this evidence would have been relevant to rebut the State's theory that appellee's motive for murdering McCaleb was to collect life insurance proceeds because the expected workers' compensation recovery called into question the alleged motive.

Allen further discussed several other problematic witnesses: Carl Fuller, who was at appellee's house on the day of the murder, had a "bad" memory; Gary Bunker, who "heard gunshots and some voices" on the night of the shooting, was now deceased; Harry Krater, a former next door neighbor whom appellee reportedly "told ... everything," could not be located. Allen concluded by stating that he had not seen any "newly discovered facts, witnesses, [or] physical evidence" in the case since 1985.

Jon DeFrance, a neuropsychologist and neuroscientist, testified regarding appellee's mental faculties, her ability to testify, and her ability to aid counsel in her defense. Specifically, he stated that compared to her abilities in 1986, she would now be at a "tremendous disadvantage" in terms of assisting her counsel at trial. DeFrance performed an in-depth evaluation of appellee and concluded that she had "deficits" compared to age norms in four areas: processing speed, memory, attention, and "executive functioning"; the latter facility DeFrance described as a "general control over the person's behavior." He said that appellee reported suffering a "very significant head trauma" when she was in high school and that this event might explain her comparatively decreased functioning. DeFrance additionally suggested that appellee should not testify due to the inherent stress involved, coupled with her propensity to become confused and her lack of memory precision. He

acknowledged, however, that she was competent to stand trial.

Appellee's son, Lloyd Gregory Krizan, testified that before retirement he was an HPD lieutenant. He explained that appellee's mental abilities, including her memory, have progressively deteriorated since 1985. He said, for example, that she regularly repeats herself and cannot "tell a story and keep her facts straight."

Robert Parrish, one of the homicide investigators who worked on the murder investigation in 1985, testified that appellee was not arrested for or charged with McCaleb's murder at that time because the police investigators and the assistant district attorney ("A.D.A.") assigned to the case "were all in agreement [that] they just didn't have enough to go forward with a winnable case." He did not believe that any additional evidence regarding the case had been developed in the intervening years despite additional forensic testing. He denied that the delay in prosecution was for the purpose of gaining a tactical advantage or to be unfair to appellee. Lastly, he stated that his opinion with regard to whether murder charges should be brought against appellee had not changed.

D.S. Wilker testified that she is a retired police officer who had been "brought back" to work on the HPD Cold Case Squad. In 2007, Wilker reexamined the McCaleb murder case. She requested that DNA testing be performed on certain evidence, but no new evidence was developed. She did not bring the case to the attention of the district attorney's office or otherwise seek to have charges filed.

Victor Wisner testified that he formerly worked at the Harris County District Attorney's Office. He stated that while he was there, Wilker regularly contacted him regarding cold case files. When she called him regarding the McCaleb murder investigation, they arranged a meeting with the two of them, a D.A.'s office investigator, a police captain, and a police lieutenant. After that meeting, Wisner decided to file murder charges against appellee. He understood that the original A.D.A. on the case in 1985 did not think the case was worth pursuing but that he [Wisner] and two other current A.D.A.s believed otherwise. According to Wisner, the police captain who attended the meeting explained that charges were not filed in 1985 because of a perceived inability to disprove appellee's version of events (i.e., that the rapist who had previously attacked her returned and murdered her husband). Wisner felt this concern to be unimportant; he thought that the case against appellee was "a lot better than a lot of cases that are tried here every day." He stated that in 1985 prosecutors filed a "ludicrous bigamy case" against appellee, which was subsequently dismissed. He opined that embarrassed prosecutors did not wish to further pursue any case against appellee. In his opinion, no one in the D.A.'s office or HPD delayed the case in order to gain a tactical advantage.

At the conclusion of the hearing, the trial court granted appellee's motion to dismiss. In comments accompanying the ruling, the trial judge concentrated on the Fifth Amendment due process issue. The court further suggested that if the charges proceeded to trial, appellee would be denied effective assistance of counsel due to the loss of evidence and the loss of appellee's ability to effectively communicate with counsel.

After the hearing, the trial court entered findings of fact as follows: DeFrance was an expert, and based on his testimony, appellee's mental state had deteriorated more rapidly than average, rendering her "effectively unable to testify," and "severely disadvantaged in assisting her counsel." Greg Krizan's testimony was credible con-

cerning appellee's mental deterioration and lessened ability to recall details. Based on Allen's testimony, Thompson (appellee's former counsel) and McDonald (the forensic examiner hired by Thompson) were deceased, and Gonzalez (appellee's former investigator) did not recall the work he performed on the case. Various items relating to Thompson's representation and Gonzalez's investigation had been lost, as had medical records relating to appellee and McCaleb. Other potential witnesses, including Fuller, Bunker, and Krater, were either deceased, unable to be found, or suffering from poor memory. Based on Wilker and Wisner's testimony, HPD had conducted no additional investigation and had discovered no new evidence since "1985 or 1986." The State was prosecuting appellee despite prosecutors' knowledge that evidence favorable to the defense had been lost or destroyed and that "the original lead investigator [apparently meaning Parrish] still feels the charges should not have been filed due to lack of evidence."

The court also entered conclusions of law: Appellee had "suffered both presumptive and actual substantial prejudice due to the delay in filing this charge," and such delay was "for the purpose of gaining a tactical advantage ... at trial." The delay violated appellee's rights to (1) due process under the Fifth and Sixth Amendments; (2) a fair trial and effective assistance of counsel under the Sixth Amendment; (3) due course of law under article I, section 19 of the Texas Constitution and the Code of Criminal Procedure; (4) testify pursuant to the Fifth Amendment; and (5) call witnesses under the Sixth Amendment. The court further determined that the legal doctrine of laches barred the charges because of the State's delay in seeking an indictment.

## II. Standards of Review

■ In its sole issue on appeal, the State contends that the trial court erred in dismissing the indictment.[1] We review a trial court's dismissal of an indictment under a bifurcated standard. *See State v. Moff*, 154 S.W.3d 599, 601 (Tex.Crim.App. 2004); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). We afford almost total deference to a trial court's determination of historical facts that are supported by the record, particularly when such findings of fact are based on an evaluation of witnesses' credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We afford the same amount of deference to a trial court's "application of law to fact" rulings, when those rulings turned on an evaluation of credibility and demeanor. *Id.* However, when resolution of a question of law does not turn on an evaluation of credibility and

---

1. In its "Issue Presented," the State specifically stated: "Did the trial court err in determining the State intentionally delayed this prosecution in bad faith simply because it indicted appellee 22 years after the offense?" But as will be discussed in this opinion, between its initial appellate brief and reply brief, the State has briefed each of the issues listed by the trial court as bases for dismissing the indictment. In her brief, appellee urges that we find that the State waived its arguments on certain grounds for dismissal by not raising them in its original brief. In our discretion, we will treat the State's reply brief as a supplemental brief, under Texas Rule of Appellate Procedure 38.7, and consider all of the arguments raised. *See Boyle v. State*, 820 S.W.2d 122, 141 (Tex.Crim.App.1989) ("Whether to discuss new matters raised in a supplemental brief is left to the sound discretion of the court."); *Houston v. State*, 286 S.W.3d 604, 612 (Tex.App.-Beaumont 2009, pet. ref'd) (treating reply brief as supplemental brief under Rule 38.7); *Skillern v. State*, 890 S.W.2d 849, 882 (Tex.App.-Austin 1994, pet. ref'd) (exercising discretion to consider newly raised matter). The State filed the reply brief prior to submission and oral argument, and both sides fully briefed the issues.

demeanor, we review the issue under a *de novo* standard. *Moff,* 154 S.W.3d at 601.

## III. Due Process

The state has challenged all of the grounds for dismissal mentioned by the trial court in its findings of fact and conclusions of law. Allegations of constitutional violations based on a time gap between offense and indictment are typically analyzed as Fifth Amendment due process issues. *See, e.g., United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Ibarra v. State,* 11 S.W.3d 189, 193–94 (Tex.Crim.App.1999). We will therefore begin our analysis with the State's challenge to the due process ground for dismissal.

■ Statutes of limitations are the primary assurance against the bringing of unduly stale criminal charges. *Marion,* 404 U.S. at 322, 92 S.Ct. 455; *Ibarra,* 11 S.W.3d at 193. However, the Texas legislature has not enacted a statute of limitations for the offense of murder. *Ibarra,* 11 S.W.3d at 193. The Due Process Clause also provides some measure of protection against excessive pre-indictment delay. *Lovasco,* 431 U.S. at 789, 97 S.Ct. 2044; *Marion,* 404 U.S. at 324–25, 92 S.Ct. 455; *Ibarra,* 11 S.W.3d at 193. In *Marion,* the United States Supreme Court acknowledged the existence of such protection but resisted the call to set specific guidelines, stating that:

> [T]he Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. However, we need not, and could not

now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases.

404 U.S. at 324–25, 92 S.Ct. 455.

In *Lovasco,* the Court explained that "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 97 S.Ct. 2044. The court then went on to criticize the court of appeals in that case for holding that the State's reasoning did not justify the delay, stating:

> Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." Our task is more circumscribed. We are to determine only whether the action complained of here, compelling respondent to stand trial after the Government delayed indictment to investigate further violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," ... and which define "the community's sense of fair play and decency" ....

*Id.* (quoting *Rochin v. California*, 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)). The *Lovasco* court additionally wrote at length regarding the possible merits of leniency toward prosecutorial delay, including that requiring prosecutors to bring charges quickly could (1) limit the State's ability to further investigate the suspect's culpability, (2) impair investigation of other possible suspects, and (3) pressure prosecutors into filing charges that they might not otherwise file. *Id.* at 790, 97 S.Ct. 2044. The court further explained that:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*Lovasco*, 431 U.S. at 795–96, 97 S.Ct. 2044.

Neither the *Marion* nor the *Lovasco* opinions defined a specific methodology for considering allegations of due process violations based on pre-indictment delay. Instead, such development appears to have been intentionally left for the lower courts. The federal circuits are, in fact, split regarding the proper methodology. The Ninth Circuit, among others, holds that a defendant in such cases has the initial burden to demonstrate that the delay has caused him "actual and substantial prejudice"; the State must then proffer a reason for the prosecutorial delay, and the court balances the given reason against the severity of the prejudice. *See, e.g., U.S. v. Moran*, 759 F.2d 777, 782–83 (9th Cir.1985). In contrast, the Fifth Circuit, and others, currently hold that in order to be entitled to relief under the Due Process Clause for pre-indictment delay, a defendant must demonstrate that such delay: (1) caused substantial prejudice to his or her right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the accused "or for some other impermissible, bad faith purpose." *See, e.g., U.S. v. Crouch*, 84 F.3d 1497, 1514 (5th Cir.1996).[2]

The Texas Court of Criminal Appeals has largely adopted the Fifth Circuit methodology, holding that to be entitled to relief, a defendant must demonstrate that pre-indictment delay: "(1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the accused." *Ibarra*, 11 S.W.3d at 193 (citing *Marion* and *Spence v. State*, 795 S.W.2d 743, 749 (Tex.Crim.App.1990)). Although the court in *Ibarra* did not expressly state that it was adopting the additional "other impermissible, bad-faith purposes" language from *Crouch*, it stated in an operative sentence that: "nothing in the record suggests the State intentionally delayed the case to gain a tactical advantage over

---

**2.** The Fifth Circuit had previously used the balancing test but in *Crouch* specifically adopted the two-pronged test, requiring the defendant to prove both prongs. 84 F.3d at 1514; *see also Stoner v. Graddick*, 751 F.2d 1535, 1542 n. 4 (11th Cir.1985) (discussing the early inconsistency in Fifth Circuit methodology).

appellant *or otherwise acted in bad faith."* *Id.* (emphasis added). Thus far, neither the Court of Criminal Appeals nor the Fifth Circuit has defined what other reasons for delay might be considered "in bad faith." *See Crouch,* 84 F.3d at 1514 ("We need not now attempt to catalogue all possible 'other' impermissible, bad faith purposes of intentional delay, although *Marion* indicates that a purpose 'to harass' the defendant would be included. As suggested by *Marion* and *Lovasco,* we leave that to further case-by-case development.").

The case currently before us presents interesting circumstances for application of the Fifth Circuit and Texas two-prong test. After twenty-three years of delay, no new evidence was uncovered. Appellee was indicted after a different prosecutor simply looked at the case and disagreed with the earlier decision not to prosecute. Meanwhile, the only developments in the case have been the death of witnesses and defense counsel, the loss of evidence, and the mental deterioration of the defendant.

▮▮▮▮ The State has conceded that appellee met the first prong of the test by demonstrating that the twenty-three year delay between the offense and the filing of charges has caused substantial prejudice to her defense efforts. However, we agree with the State that there is no evidence in this case that the delay was intended to gain a tactical advantage over appellee or for another improper purpose. Instead, the only evidence regarding the prosecutorial gap indicated that the original prosecutor and police investigators did not believe the case to be winnable. A later prosecutor, Wisner, believed that the case was worth pursuing based on the 1985 evidence. Even though the delay was apparently not for investigative purposes, appellee failed to meet her burden of showing an intentional delay for tactical advantage or other bad faith purpose.

There is no requirement in Texas that a continuous investigation take place. *See Ibarra,* 11 S.W.3d at 193 ("We are unaware of any requirement that the police conduct continuous investigation."). Many courts have held that the defendant must produce solid evidence of intentional delay for an improper purpose, not just conjecture. In *Crouch,* the court held that a delay occasioned by a lack of funding for investigators was not intentional delay for an improper purpose. 84 F.3d at 1514. In *Ibarra,* the court held that no due process violation occurred when a procedural legal rule (concerning search warrants) changed, making certain evidence available that was not available under the prior rule. 11 S.W.3d at 191–93. The court likened the situation to one wherein advances in DNA testing made previously unavailable information accessible. *Id.* at 193–94. In *Stoner v. Graddick,* the Eleventh Circuit affirmed a lower court's denial of habeas corpus because the defendant failed to show that the State delayed prosecution for nineteen years in order to gain a tactical advantage. 751 F.2d 1535, 1543 (11th Cir.1985). The only evidence regarding the reason for the delay was inconclusive: a retired police officer testified that he did not know why the case had not been prosecuted earlier. *Id.* The trial court concluded, and the appellate court apparently concurred, that the original prosecutors simply must have doubted the sufficiency of the evidence to prosecute. *Id.* In *United States v. Proctor,* the Fifth Circuit rejected an assertion that bad faith was manifest from the fact that prosecutors "had all the evidence to prosecute" almost five years before filing charges. 505 F.3d 366, 370 (5th Cir.2007). The court stated that bad faith cannot be implied "simply from the fact of the delay." *Id.* In *Grimaldo v. State,* the court held that the defendant failed to meet his burden because "although no good reason [was] ap-

parent from the record for the delay, likewise the record [did] not show any bad faith reason for the delay." No. 07–99–0006–CR, 2000 WL 798800, at *3 (Tex. App.-Amarillo June 21, 2000, no pet.) (not designated for publication). Lastly, in *Pelkey v. State,* this court held that the defendant failed to meet his burden where a set of prosecutors examining "cold cases" decided to prosecute where police had originally believed that prosecutors would not accept the case. No. 14–00–00904–CR, 2002 WL 192346, at *2 (Tex. App.-Houston [14th Dist.] Feb. 7, 2002, pet. ref'd) (not designated for publication).[3]

Based on these cases, we hold that as a matter of law the evidence in the present case does not establish that the prosecutorial delay was an intentional device used to gain a tactical advantage over the accused or for other bad faith purposes. *See Ibarra,* 11 S.W.3d at 193. Whether Wisner's testimony is believed or disbelieved, there is still no evidence of intentional delay to gain an advantage. Accordingly, the trial court erred in dismissing the indictment on the ground that appellee's due process rights were violated by the pre-indictment delay.[4]

## IV.   Other Bases for Relief

The following additional rights were referenced by the trial court as bases for dismissing the indictment: (1) to enjoy due course of law under article I, section 19 of the Texas Constitution; (2) to receive effective representation under the Sixth Amendment and article I, section 10 of the Texas Constitution; (3) to testify and present a defense, as guaranteed by the Fifth and Sixth Amendments, article 1, sections 10 and 19 of the Texas Constitution, and the Texas Code of Criminal Procedure; and (4) to receive a fair trial pursuant to the Sixth Amendment. Additionally, the court determined that the indictment was barred by the doctrine of laches.[5]

### A.   Due Course of Law

The State contends that the trial court erred in finding a violation of appellee's right to due course of law under article I, section 19 of the Texas Constitution. We have previously held that in cases of pre-indictment delay, the appropriate due course of law analysis is the same as that for due process. *State v. Kuri,* 846 S.W.2d 459, 471 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd). Accordingly, based on our due process analysis above, we hold that appellee's right to due course of law was not violated by the delay in this case. The trial court erred in holding otherwise.

### B.   Effective Representation

■ Next, the State argues that the trial court erred in finding a violation of appellee's right to effective representation

---

3.  As unpublished cases, *Pelkey* and *Grimaldo* do not compel our resolution in this case; however, they provide additional context in which to view the state of the law in this area of due process analysis.

4.  Under the Ninth Circuit's methodology, the result in this case might be different from that which we reach under the two-prong Texas and Fifth Circuit analysis. Under the Ninth Circuit balancing test, appellee has demonstrated actual and substantial prejudice, the State has proffered no reason for the delay other than that the prosecutor and police at one time did not believe that they had enough evidence to prosecute, and the balance could tip toward finding a due process violation. *See Moran,* 759 F.2d at 782–83.

5.  The State asserts that the trial court based the dismissal of the indictment solely on findings that the delay violated appellee's due process rights and right to effective representation. However, because the trial court entered findings of fact and conclusions of law supporting the dismissal on several additional grounds, the State's assertion is clearly incorrect. The State briefed the merits of each of the additional grounds, and we will address each on the merits.

of counsel. A criminal defendant is entitled to "the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). The trial court found that the State's pre-indictment delay violated appellee's right to counsel due to the loss of evidence and her inability to effectively communicate. But the right to counsel as defined by the Supreme Court focuses on the provision and performance of counsel and not on assurances regarding the state of the evidentiary case with which a defendant's attorney has to work. *See generally id.* at 685–86, 104 S.Ct. 2052 (explaining that the right to counsel guaranties representation by counsel, that defense counsel will provide "adequate legal assistance," and that the government may not interfere with counsel's decision-making).

■ Prejudice resulting from pre-indictment prosecutorial delay may implicate due process concerns. *See Crouch,* 84 F.3d at 1514; *Ibarra,* 11 S.W.3d at 193–94. Yet we discern no basis for the dismissal of an indictment on the ground that prejudice flowing from a pre-indictment delay unconstitutionally affected a defendant's right to counsel. Consequently, the trial court erred in dismissing the indictment on the ground that appellee's right to counsel was violated.

### C. Testify and Present a Defense

The State additionally challenges the trial court's holding that the delay in prosecuting this case violated appellee's rights to testify and to present a defense. To support her claim of violation of these particular rights, appellee introduced evidence of her inability to testify, the death or disappearance of witnesses, and the loss or destruction of certain physical evidence. Appellee has cited a number of sources— the Fifth and Sixth Amendments to the United States Constitution; article 1, sections 10 and 19 of the Texas Constitution; and the Texas Code of Criminal Procedure—to establish her unassailable right to testify and to present a defense. *See generally Rock v. Arkansas,* 483 U.S. 44, 49–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (right to testify); *Crane v. Kentucky,* 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (right to present a defense). She has not, however, cited any authority, and we have discovered none, suggesting that such rights are implicated by pre-indictment delay.

The rights to testify and to present a defense typically apply in specific and well-developed contexts, often involving prohibitions against direct government action which prevent exercise of the given rights. For example, in *Crane* the Supreme Court cited the right to present a defense in holding that in the absence of "valid state justification," a State's evidentiary rules could not "exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." 476 U.S. at 690–91, 106 S.Ct. 2142. Similarly, in *Rock,* the Court cited the right to testify in holding that a state could not by *per se* rule prevent a defendant from testifying on his own behalf after he had undergone hypnosis to refresh his memory. 483 U.S. at 56–62, 107 S.Ct. 2704.

■ Here, appellee is not complaining that the State or the trial court would directly prevent her from testifying or from presenting certain evidence or questioning certain witnesses. Rather, her arguments are premised on the notion that the very lapse of time between offense and indictment (occasioned by the State's inaction) will prevent her from testifying and presenting a defense. Although pre-indictment delay may implicate due process concerns, *see Crouch,* 84 F.3d at 1514;

*Ibarra,* 11 S.W.3d at 193–94, we do not believe that the rights to testify and present a defense require dismissal of an indictment based solely on delay in bringing an indictment. Accordingly, the trial court erred in dismissing the indictment based on alleged violations of appellee's rights to testify and present a defense.

### D. Fair Trial

The State also challenges the trial court's holding that the delay violated appellee's Sixth Amendment right to a fair trial. It is uncertain on this record whether appellee or the court considered the Sixth Amendment as providing a basis for the dismissal not covered by other grounds more specifically mentioned, *i.e.,* the Fifth Amendment due process argument and the rights to testify, to present a defense, and to effective representation all discussed above. In her appellate briefing, the only arguments appellee has made regarding violation of her Sixth Amendment right to a fair trial are that (1) she was prejudiced by the delay and (2) "the charges are overly stale." These arguments are more appropriately analyzed in the context of Fifth Amendment due process rights.

■ Furthermore, the only case appellee cites in support of her fair trial appellate arguments is the Supreme Court's opinion in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In Marion, the Court declined to extend Sixth Amendment protections to the period prior to arrest. *Id.* at 321, 92 S.Ct. 455. Instead, the Court indicated that pre-indictment delay should be analyzed under the Fifth Amendment right to due process. *Id.* at 324, 92 S.Ct. 455. The trial court erred in dismissing the indictment on the basis of the Sixth Amendment right to a fair trial.

### E. Laches

Lastly, the State challenges the trial court's holding that the indictment of appellee was barred by application of the doctrine of laches. In *Ex Parte Carrio,* the only case appellee cites, the Texas Court of Criminal Appeals held that the doctrine of laches should be utilized in determining whether to consider a post-conviction application for writ of habeas corpus where the applicant's delay in filing the application prompted the State to claim prejudice to its ability to respond. 992 S.W.2d 486, 487–88 (Tex.Crim.App. 1999).[6]

■ *Carrio* is not a pre-indictment delay case. In it, the court followed the federal practice of using laches to assess the consequences of delay in applications for writ of habeas corpus. *Id.* at 487. This is a very narrow use of this equitable doctrine. There is no suggestion in the opinion that the doctrine should apply in any other criminal context. We see no reason to extend use of the doctrine into the realm of pre-indictment delay, where the Court of Criminal Appeals has already set forth a test governing our analysis. *See Ibarra,* 11 S.W.3d at 193–94. For this reason, we find that the trial court erred in dismissing the indictment pursuant to the doctrine of laches.

---

**6.** The *Carrio* court referenced Black's Law Dictionary in defining the doctrine:

The doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.

992 S.W.2d at 487 n. 2 (quoting Black's Law Dictionary 875 (6th ed. 1990)).

## V.  Conclusion

For the reasons stated above, we hold that each of the grounds cited by the trial court in dismissing the indictment is without merit.  Consequently, the trial court erred in dismissing the indictment.  We sustain the State's sole issue on appeal.

We reverse the trial court's order of dismissal and remand for further proceedings in accordance with this opinion.